D. Dennison FINCKE

v.

The UNITED STATES.

No. 470–80C.

United States Court of Claims.

March 24, 1982.

Michael B. L. Hepps, Philadelphia, Pa., atty. of record for plaintiff.

Stephen G. Anderson, with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and NICHOLS, Judge.

SKELTON, Senior Judge, delivered the opinion of the court:

This is a suit by D. Dennison Fincke, the plaintiff, to collect the sum of $300,000 from the United States for an alleged breach of an express contract by the United States Embassy in Athens, Greece, to pay him an insurance commission or, in the alternative, to collect such amount for an alleged breach of a contract implied in fact to pay him such commission or, in the further alternative, for the recovery of the reasonable value of his services by reason of an alleged implied quantum meruit contract to act as a consultant for the Embassy in connection with its purchase of a group hospitalization, surgical and medical insurance policy for its Greek employees. The defendant denies the existence of any contract relationship, express or implied, with the plaintiff, and moves to dismiss his suit. The case is before us on cross motions for summary judgment. We hold for the defendant. The facts are as follows:

The plaintiff, D. Dennison Fincke, was an independent insurance broker in Athens, Greece, in December, 1977, when he was requested by the then Counselor of the United States Embassy for Administrative Affairs in Athens, Mr. James J. Soldow, to come to the Embassy for a meeting to discuss group insurance benefits for foreign national employees of the Embassy. Theretofore, beginning on January 29, 1974, such employees had been provided group hospitalization, surgical and medical insurance under Contract No. S–23FA–1537 (the "Plan") by The Hospital Service Plan (HSP), a non-profit corporation of Kent, England, that was organized and doing business under the laws of the United Kingdom. Efforts to improve the Plan were undertaken from time to time by both the Embassy and the so-called "Committee of Ten" representing the foreign national employees. The proposed meeting between the plaintiff and Soldow was in furtherance of these efforts.

Pursuant to the request, the plaintiff went to the Embassy and conferred with Soldow about insurance that would provide better coverage and more benefits for the Greek employees. At the meeting, the plaintiff said that he needed a broker-of-record letter from the Embassy before he would begin work on locating a new group insurance plan for the Embassy. Soldow asked the plaintiff to draft such a broker-of-record letter. The plaintiff did so and submitted the letter to Soldow for his signature. Soldow was authorized by the Department of State in Washington to sign the letter and he signed it on February 2, 1978. It is as follows:

EMBASSY OF THE
UNITED STATES OF AMERICA

Athens, Greece

February 2, 1978

TO WHOM IT MAY CONCERN:

Please be advised that the Fincke Insurance Agency has been selected to act as Broker of record in connection with our group insurance program. You are instructed to deal only with this agency regarding your proposals for group Insurance Benefits and Premiums for the US Embassy employees.

Should your company be selected as our Insurance carrier, it is understood that the Fincke Insurance Agency will be the Broker for any and all Commissions payable.

Sincerely

(Signed) James J. Soldow

James J. Soldow

Counselor of Embassy

for Administrative Affairs

There is no evidence in the record that Soldow had any information or knowledge that the term "broker of record" had any meaning other than that which was stated in the letter. The plaintiff stated in an affidavit attached to his brief that he explained to Soldow that the purpose of the letter was to guarantee him that he would be eventually paid for the work that he was about to do. However, he did not explain how the guaranty would serve this purpose, nor who would be the guarantor, nor the amount that was to be guaranteed. He did inform Soldow that he would seek net quotations from insurance companies (i.e., without commissions) and that he would add approximately 10% to the quotation for his commission, which would be added to the premium and paid to him by the insurance company that was awarded the business.

Soldow stated in an affidavit that is in the record that when he met with the plaintiff the first time, the plaintiff offered to develop an insurance program for consideration by the Embassy at no cost. With reference to the purpose of the broker-of-record letter, Soldow stated that the plaintiff explained that the letter, which he had drafted, would assist him in dealing with the several insurance companies whom he planned to contact in developing the most advantageous insurance program. Soldow stated further that the plaintiff "reiterated" that the letter did not commit the Embassy to making any payment to him nor to accepting his eventual insurance proposal. The plaintiff has not denied making these statements.

After the plaintiff had made these representations, Soldow signed the letter and gave it to plaintiff. Soldow also furnished the plaintiff a copy of the existing insurance plan with HSP, an indication of past experience with the existing plan, the number and composition of the covered employees, a copy of their pay scale, and other data and information requested by the plaintiff. Thereafter, the plaintiff began soliciting proposals for group insurance for the Embassy's foreign national employees from various insurance companies in Europe and in the United States. He wrote to the Hospital Service Plan, the company servicing the existing plan, and asked it to submit a proposal. The company did so but it stated that it would not pay a fee or commission to get the business. The plaintiff received various other proposals from companies that would pay a fee or commission to him if awarded the contract, which fee or commission would be included in the premiums. One of these companies was American Life Insurance Company of the United States (ALICO).

On April 25, 1978, Mr. Fincke presented to the Embassy and its employees a comparison of the existing Hospital Service Plan coverage with a proposal for insurance coverage by the American Life Insurance Company. Mr. Fincke strongly urged that the Embassy terminate the existing coverage with HSP and sign a new agreement with ALICO.

The premiums for the existing HSP plan were paid entirely by the Embassy but, if benefits were to be significantly expanded, the new plan was expected to be contributo-

ry, with the employees paying a portion of the premium. The Embassy decided to poll the employees to determine their preference between the new plan of ALICO and the existing plan of HSP. The employees favored the existing HSP plan by a margin of 25 to 1. After the result of the poll was known, Patricia Kemper, personnel officer of the Embassy who favored the ALICO plan submitted by the plaintiff, stated that "the Greeks resented the fact that he [the plaintiff] was going to be paid by the insurance company." Of course, had the ALICO plan been adopted, the employees would have been required to pay a part of the plaintiff's commission by their contribution to the increased premiums which would have included the commission. Instead, the employees chose to keep the existing plan with no additional benefits and with the Embassy paying all of the premiums.

The Embassy acceded to the preference of the employees and renewed the HSP plan on June 28, 1978, for another year. When this was done, the plaintiff did not ask HSP to pay him a commission. Neither did he ask the Embassy to pay him a commission or any other remuneration for the work that he had done in getting the insurance proposals and in analyzing and presenting them to the Embassy with his recommendations. This is significant in view of the claims he is now making against the Embassy and the government in this case, which will be discussed fully below.

In September, 1978, Mr. Soldow retired and was replaced by Henry Boudreau. The personnel officer who had been assisting Mr. Soldow, Patricia Kemper, retired in November, 1978, and was replaced by Irene Bower.

Mr. Fincke continued his efforts from his office in Philadelphia, Pa., despite the renewal of the HSP plan. He solicited proposals from six major American insurance companies other than ALICO but none of them were initially interested. Eventually, however, a proposal was put together by The Travelers Insurance Companies ("Travelers") and its affiliate in Greece, Ruinione Adriatica DiSicurta ("Adriatica"). The Travelers/Adriatica proposal was to duplicate the 1978 ALICO plan at the same cost. In the meantime, however, HSP had itself offered a new plan to the Embassy. This prompted a second proposal from Travelers/Adriatica. Mr. Fincke sent charts to the Embassy dated March 5, March 27, and April 24, 1979, setting out comparisons among the new HSP plan (known as the Private Patients Plan or PPP), the 1978 ALICO plan, and the two Travelers/Adriatica plans. He recommended the Travelers/Adriatica plan.

On April 2, 1979, the Embassy published an administrative notice explaining the various proposals available to its foreign national employees and requesting that the employees indicate their preference among the four plans. As in the prior year, the overwhelming (94%) preference was for the HSP plan and, on April 30, 1979, the Embassy published an administrative notice advising the foreign national employees that it would contract for the new HSP plan, which would become effective June 1, 1979.

Having learned of the preference of the Greek employees shortly after the votes were counted, Mr. Fincke wrote to his Congressman, Richard T. Schulze, on April 26, 1979, with a carbon copy to Travelers, in which he related the foregoing events and asked for his help in getting the contract awarded to Travelers. Significant portions of his letter as related to this case stated the following:

Last week the votes were counted, and the employees chose a plan offered by the Hospital Service Plan, and [sic] English company, as opposed to *our plan* underwritten by The Travelers.

\* \* \* \* \* \*

Our company which employs ten people locally here in West Chester worked long and hard on this case, and we do not understand why our own Government would *reject us* in favor of a foreign company with an inferior proposal.

\* \* \* \* \* \*

*You are our only hope in this matter because you represent the ten people in our office most directly affected by this situation.* The new plan is scheduled to begin June 1, so any action you may take should be done soon or it will be too late . . . . (emphasis supplied).

Shortly thereafter, on May 1, Mr. Fincke wrote to Mr. Boudreau at the Embassy (again with a carbon copy to Travelers) in a final effort to persuade him of the merits of the Travelers/Adriatica plan over the new HSP plan. That letter stated, in part:

The question remains as to just why you have gone to such lengths to favor the English company at the expense of the U. S. taxpayer, the American insurance company, *and the American broker.* I would have thought that you would do quite the opposite if for no other reason than *to help protect jobs here* and to not export U. S. dollars needlessly. I can only hope that the State Department will disapprove your decision and try to find a fair solution to all concerned parties. (Emphasis supplied).

These efforts by Mr. Fincke did not succeed in reversing the Embassy's decision to enter into a contract with HSP for its new plan, which was executed on June 1, 1979. On learning that the contract was going to be signed between the Embassy and HSP, the plaintiff changed his position so that he no longer sought to sell the insurance of the American companies who would pay him a commission but instead sought to collect a commission from HSP, and, failing in that, indicated for the first time that he was going to assert a claim against the United States for a commission. This is shown in a letter from him to Congressman Schulze dated May 30, 1979. Pertinent parts of the letter are as follows:

* * * The problem in this case is that the English company does not want to pay any commission, and I have no way of forcing them to do so without the help of the Department of State. At all times from January, 1978, until now I dealt in good faith putting in long hours and going to a great deal of expense. I feel it is time for the Department of State to honor its side of the bargain and instruct the English insurance company to execute an agreement with me and pay commissions.

\*   \*   \*   \*   \*   \*

* * * In this instance, however, we have a clear case of Messrs. Soldow and Boudreau retaining my professional services exclusively, not simply accepting a bid from me as one of many brokers. Therefore, I am entitled to receive proper compensation.

At this point we do not need any more reports on the subject. I am requesting that you use your good office to exert pressure on the Department of State to do one of two things. *Either they should instruct the English company to pay commissions to me, or else the Department of State should pay me directly.* (Emphasis supplied).

Congressman Schulze communicated the substance of this letter to the Department of State. The Department answered him on June 26, 1979, saying, in part, that the plaintiff's positions had been inconsistent in that he, at all times, sought to oust the HSP and sell insurance offered by American companies whom he represented as agent, but now he was trying to collect a commission from HSP whom he had not represented. The Department pointed out also that it had no authority to order HSP to pay him a commission nor any way to enforce such an order if made. Also, the Department stated that the plaintiff had always been regarded as a salesman by the Embassy and that he had never been hired by the Embassy as a consultant or otherwise, and the Embassy had never agreed to pay him for his services, or to otherwise compensate him for his efforts to sell the insurance of the American companies. The Department concluded by saying it could not and would not compensate the plaintiff for his efforts nor pay him a commission, and that, in its view, he was simply an unsuccessful salesman and his expenses a risk of doing business.

Having failed to collect a commission from HSP, the plaintiff filed this suit on September 4, 1980.

**294**

Plaintiff asserts three bases for recovery against the United States. Count I of the petition alleges that the broker-of-record letter is an express contract obligating the United States to pay plaintiff a commission on premiums paid to HSP under its new group health insurance contract with the Embassy. Count II alleges the existence of an implied-in-fact contract between the Embassy and the plaintiff for payment of such a commission. Count III seeks recovery of compensation on an alleged implied contract for quantum meruit between the Embassy and plaintiff for plaintiff's services as a consultant. We will consider these counts in the order named.

### I. *The Express Contract Claim*

The plaintiff says that the broker-of-record letter signed by Mr. Soldow constituted an express contract between him and the Embassy that obligated the United States to pay him a commission of 10% of the premium paid by the Embassy on any insurance policy purchased by it for its Greek employees for a period of 10 years, which amounted to the total amount of one year's premium in the sum of $300,000. We do not agree. The letter was not a contract for many reasons. On its face, it does not purport to be a contract. It is not addressed to the plaintiff, but "To Whom It May Concern." The plaintiff did not sign it. The letter did not obligate the plaintiff to do anything. It was more in the nature of a notice to prospective insurance companies who might wish to submit insurance proposals to the Embassy as to the procedure they should follow. There is no provision in the letter that obligated the Embassy to pay the plaintiff anything. It is obvious that the plain meaning of the second paragraph of the letter was that if any company represented by the plaintiff was selected by the Embassy as its insurance carrier and that company paid a commission (i.e., a commission was "payable"), the plaintiff would receive that commission as far as the Embassy was concerned, but this was a matter between the plaintiff and the insurance company and without any liability on the part of the Embassy. Of course, in this case no commission was "payable" to

plaintiff or anyone else by HSP, the company that sold the insurance to the Embassy, for at least two reasons, namely, (1) HSP does not pay commissions for insurance, which was a fact well known by plaintiff, and (2) the plaintiff did not represent HSP and did not sell its insurance to the Embassy, but did everything he possibly could to keep the Embassy from buying the insurance from that company.

In construing a document to determine whether or not it is a contract, the primary function of the court is to determine the intention of the parties. *North American Philips Company v. United States*, 175 Ct.Cl. 71, 358 F.2d 980 (1966). In the instant case, there is no evidence that the parties intended that the broker-of-record letter imposed any obligation on the Embassy to pay the plaintiff a commission. In fact, the evidence is to the contrary. As stated above, the plaintiff stated to Soldow that the letter "did not commit the Embassy to making any payment to him." The plaintiff stated further that he would develop an insurance program for consideration by the Embassy "at no cost." There is no provision in the letter that required the Embassy to pay plaintiff a commission. If the letter is ambiguous, it must be construed against the plaintiff who drafted it. *Sturm v. United States*, 190 Ct.Cl. 691, 421 F.2d 723 (1970), and cases cited therein. However, we think the letter is clear and unambiguous and shows an intention of the parties not to obligate the Embassy to pay a commission to the plaintiff.

The plaintiff argues that he told Soldow that the purpose of the letter was to "guarantee me that I would be eventually paid for the work I was about to do." The trouble with this argument is that the letter is not a guarantee by anyone to do anything. Evidently, the plaintiff meant by this statement to indicate that the letter would eliminate competition from other insurance brokers so that if he sold a policy for a company who paid a commission he would have a better chance to be paid by

the company for his work. The letter was not a guarantee by the Embassy that plaintiff would be paid a commission.

■ The plaintiff argues that in the insurance industry the issuance of a broker-of-record letter constitutes "a guarantee that the broker will be paid for his services." As we previously noted, however, there is no indication in the record that Soldow, the Counselor for Administrative Affairs at the American Embassy in Athens, was familiar with the usages of the insurance industry or whether he understood the letter to have that effect. In these circumstances, Soldow's signing of the letter cannot be deemed to adopt any alleged practice in the insurance industry that issuance of such a letter obligates the signer to pay commissions.

We hold that the broker-of-record letter was not a contract and that it did not impose any liability on the Embassy to pay the plaintiff a commission or fee for his efforts. Accordingly, the contention set forth in Count I is without merit and must be dismissed.

## II. Implied-In-Fact Contract Claim For A Commission

The plaintiff contends in the alternative that an implied-in-fact contract existed between him and the Embassy whereby the Embassy was obligated to pay him a commission on premiums paid to the company chosen to carry group medical insurance for the Embassy if the company did not itself pay the commission. The amount he claims is $360,000. He relies on the broker-of-record letter, the meetings between him and Soldow, the various reports, analyses and comparisons of policies proposed by various insurance companies which he submitted to the Embassy to support his claim.

■ It is well established that an implied-in-fact contract requires a meeting of the minds which is inferred from the conduct of the parties and, in the light of surrounding circumstances, shows their tacit understanding and agreement. *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 508 F.2d 817 (1974), and *Algonac*

*Mfg. Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241 (1970). Such an implied contract requires the same elements as an express contract, i.e., an offer, acceptance and consideration. *Baltimore and Ohio R.R. Co. v. United States*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923). With these principles in mind, we will examine the conduct of the parties to determine whether there was a tacit understanding and meeting of the minds of the parties that the Embassy would pay a commission to the plaintiff if the insurance company did not do so. Their actions and conduct before the inception of a controversy is of much greater weight than what they said or did after a dispute arose. *Truong Kuan Truc v. United States*, 212 Ct.Cl. 51 (1976); and *Macke v. United States*, 199 Ct.Cl. 552, 467 F.2d 1323 (1972).

■ The plaintiff never once mentioned to Soldow that he expected the Embassy to pay him a commission if the insurance company did not do so. As pointed out above, he stated to Soldow that he would present an insurance plan "at no cost" to the Embassy, and that the broker-of-record letter "did not commit the Embassy to making any payment to him." When the HSP plan was being considered by the Embassy, the plaintiff never once told the Embassy that his commission would have to be added to the premiums since HSP would not pay it. It is obvious that if he had thought that the Embassy would have to pay his commission in addition to the HSP premiums, he would have advised the Embassy of that fact at the time, but he did not do so. Also, it is significant that when the Embassy renewed the HSP plan in June, 1978, which was after the broker-of-record letter had been signed and after the plaintiff had submitted insurance proposals, charts, analyses and comparisons to the Embassy, he did not claim that the Embassy owed him a commission and in fact said nothing whatever about it. Then in April of 1979 when he learned that the Embassy was going to purchase the new HSP plan, he resorted to intense lobbying efforts with the Embassy to persuade it that the HSP plan was inferior to the Travelers/Adriatica plan and urged the Embassy to buy the latter plan.

He wrote to his congressman urging him to intervene on behalf of "our plan" (the Travelers/Adriatica plan) instead of the HSP plan and informed him that the jobs of 10 people in the congressman's district were at stake. All of this activity of the plaintiff was strange indeed if the Embassy was obliged to pay him a commission regardless of which company's policy was purchased, and, of course, in that case his employees' jobs would not have been in jeopardy because the plaintiff would have been paid in any event. When he learned that the Embassy had purchased the HSP plan, he tried to collect a commission from HSP, but failed. When he realized that he could not collect a commission from HSP or from one of the American companies he represented, he, for the first time, indicated that he was going to assert a claim for a commission against the Embassy.

The basic facts in this case are much like those in *Nuss v. United States*, 127 Ct.Cl. 197, 117 F.Supp. 413 (1954). In that case the plaintiffs presented plans, specifications, and an idea to the government for seamless caskets to be used to transport the bodies of soldiers buried overseas to this country. The plaintiffs were to be paid a commission by a manufacturer of the caskets if it got a contract for their purchase by the government. When the government did not purchase the caskets, the plaintiffs sued the government for a commission or fee on an alleged implied-in-fact contract. We held in that case that the plaintiffs were acting as salesmen or promoters for the manufacturer and expected to get their compensation from it, and that they had no basis for recovery against the government on an implied-in-fact contract theory. Our decision in that case is squarely against the plaintiff in the instant case.

In the case before us, the conduct of the parties, as detailed above, shows that the plaintiff did not expect, and the Embassy did not expect, that the government was going to have to pay a commission to the plaintiff if it purchased the HSP plan. The plaintiff was acting as a salesman for the insurance companies he represented, and they were to pay him a commission if they got the business.

We hold that there was no meeting of the minds inferred from the conduct of the parties that met the requirements of an implied-in-fact contract between them for the payment of a commission by the Embassy to the plaintiff, and that no such contract was created between them. Therefore, Count II must be dismissed.

### III. The Claim For Quantum Meruit Compensation As A Consultant

In Count III the plaintiff contends that he should be paid compensation on a quantum meruit basis for acting as an insurance consultant for the Embassy. He alleges that the reasonable value of his services, based on custom in the insurance industry is 10% of the premiums for 10 years which in this case would be $360,000. In the alternative, he says that his customary rate of pay for consultation and the reasonable value of his services is $135.00 per hour, and that he spent 1500 hours on this case. Therefore, he alleges that on this basis he should be paid $202,500.

Plaintiff's difficulty with this claim is that a suit to recover compensation on a quantum meruit basis is an action on a contract implied in law, as distinguished from a suit on a contract implied in fact. *United States Steel Corp. v. United States*, 210 Ct.Cl. 228, 536 F.2d 921 (1976); *Cleveland Chair Co. v. United States*, 214 Ct.Cl. 360, 557 F.2d 244 (1977); *Carpenter v. Josey Oil Co.*, 26 F.2d 442 (8th Cir. 1928); and *Campbell v. Northwestern National Life Ins. Co.*, 573 S.W.2d 496 (Tex.1978). It is well settled that this court does not have jurisdiction of claims based on an alleged contract implied in law. In *United States Steel Corp. v. United States, supra*, we held:

> We do not have jurisdiction under the Tucker Act (28 U.S.C. § 1491) of claims based on a contract implied in law (as distinguished from claims based on contracts implied in fact, which are within the jurisdiction of this court). Both the Supreme Court and this court have so held. 210 Ct.Cl. at 241–242, 536 F.2d at 927.

In *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241 (1970) we held:

This court does not have jurisdiction of claims based upon contracts implied in law. The Supreme Court said in *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925):

* * * The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law. * * *

See also *J. C. Pitman & Sons v. United States*, 161 Ct.Cl. 701, 704–5, 317 F.2d 366 (1963) and cases there cited. 192 Ct.Cl. at 674, 428 F.2d at 1256.

The defendant has not raised this jurisdictional question. However, it is the duty of the court to determine *sua sponte* whether it has jurisdiction of any claim before it, and this may be done anytime during the pendency of the case. *Save the Bay, Inc. v. United States Army*, 639 F.2d 1100 (5 Cir. 1981); *In the Matter of Jonathan Kutner, et al.*, 656 F.2d 1107 (5 Cir. 1981); and Fed.R.Civ.P. 12(h)(3).

Since we do not have jurisdiction of plaintiff's quantum meruit claim set forth in Count III, it must be dismissed.

The plaintiff has not alleged claims on which relief can be granted. Accordingly, plaintiff's motion for summary judgment is denied and that of defendant is granted and plaintiff's petition is dismissed.