**TOTAL MEDICAL MANAGEMENT, INC., Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

**No. 96–5013.**

United States Court of Appeals, Federal Circuit.

Jan. 16, 1997.

Rehearing Denied; Suggestion for Rehearing In Banc Declined March 27, 1997.

John Clifton Rand, Alexandria, VA, argued for plaintiff-appellee.

Sharon Y. Eubanks, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Richard E. Rice, Assistant Director, Dean L. Grayson and Mary L. Smith, Attorneys. Of counsel was R. Alan Miller.

Before ARCHER, Chief Judge, MICHEL and RADER, Circuit Judges.

MICHEL, Circuit Judge.

The United States ("government") appeals from the November 2, 1994 order of the United States Court of Federal Claims, No. 92–838C, granting summary judgment of contractual liability against the government in favor of Total Medical Management, Inc. ("TMM"). The order became final when, on August 31, 1995, the trial court entered judgment in TMM's favor in the amount of $57,197.50, plus interest.[1] The appeal was submitted for our decision following oral argument on July 2, 1996. We hold that, because the applicable base reimbursement rate in this local contract conflicts with valid national regulations, the contract is void as beyond the authority of the government signatory. As such, we reverse and remand with instructions to dismiss for failure to state a claim upon which relief can be granted.

## BACKGROUND

In 1956, Congress established a health plan for dependents of members of the uniformed services. This plan allowed for the provision of medical care at civilian medical facilities for those who could not be cared for at military medical facilities. *See* Dependents' Medical Care Act, Pub.L. No. 84–569, 70 Stat. 250 (1956) (codified as amended at 10 U.S.C. §§ 1071–1106) ("Act"). This plan has been implemented through the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"). 10 U.S.C. § 1072(4) (1994). The plan allows military hospitals and private health care companies to create facility-sharing arrangements. Specifically, according to section 1096(a) of the Act,

The Secretary of Defense may enter into an agreement providing for the sharing of resources between facilities of the uni-

---

1. The amount of damages was stipulated by the parties.

formed services and facilities of a civilian health care provider or providers that the Secretary contracts with under section 1079, 1086, or 1097 of this title if the Secretary determines that such an agreement would result in the delivery of health care to which covered beneficiaries are entitled under this chapter in a more effective, efficient, or economical manner.

10 U.S.C. § 1096(a) (1994). The Secretary of Defense has implemented this general power granted by Congress by encouraging military hospital commanders to enter into facility-sharing partnership agreements, upon approval of the Director of CHAMPUS and the Surgeon General of the appropriate military department, with private health care companies. *See* Department of Defense Instruction 6010.12, "Military–Civilian Health Services Partnership Program" (Oct. 22, 1987); 32 C.F.R. § 199.1(p) (1995) (permitting entry into agreements under "Military–Civilian Health Services Partnership Program"). These partnership agreements are typically memorialized in "Memoranda of Understanding" ("MOUs") or "Memoranda of Agreement" ("MOAs"). This arrangement saves the government the expense of reimbursement for treatment in expensive civilian medical facilities. This additional expense would otherwise be billed to CHAMPUS.

Instead of billing patients, the private health care companies that have entered into MOUs file claim forms with a fiscal intermediary (in TMM's case, the Associated Group) that processes and pays the claims. Prior to February 1989, the reimbursement rate scheme was as follows:

The allowable charge for authorized care shall be the lower of:

(A) The billed charge for the service;

(B) The prevailing charge level that does not exceed the amount equivalent to the 80th percentile of billed charges made for similar services in the same locality during the base period.

32 C.F.R. § 199.14(h)(1)(i) (1989).

Effective February 1, 1989, Congress modified the CHAMPUS payment rules. Department of Defense Appropriations Act of 1989, Pub.L. No. 100–463, § 8019, 102 Stat. 2270. The new reimbursement scheme is:

The allowable charge for authorized care shall be the lowest of the amounts identified . . . :

(A) The billed charge for the service.

(B) The prevailing charge level that does not exceed the amount equivalent to the 80th percentile of billed charges made for similar services in the same locality during the base period.

.    .    .    .    .

(C) For charges from physicians and other individual professional providers, the fiscal year 1988 prevailing charges adjusted by the Medicare Economic Index (MEI), as the MEI is applied to Medicare prevailing charge levels.

32 C.F.R. § 199.14(g)(1) (1990). The CHAMPUS Operating Manual and the Code of Federal Regulations both reflected this change in the reimbursement scheme, thus putting all program participants on constructive notice that the MEI could limit the reimbursement amount. 44 U.S.C. § 1507 (1994).

On November 10, 1988, TMM entered into an MOU with Ireland Army Hospital in Fort Knox, Kentucky, to provide internal medicine services for CHAMPUS beneficiaries. The MOU contained the following provision relating to reimbursement rates for services provided under the agreement:

. . . Billing rates are as follows:

(1) CHAMPUS eligibles at 75% of current CHAMPUS prevailing rate for outpatient services (current as of date of billing).

(2) All others (primarily active duty military) at 75% of current CHAMPUS prevailing rate for all outpatient services.

(3) All inpatient services at 80% of current CHAMPUS prevailing rate.

By letter dated February 10, 1989, the Associated Group informed TMM that the Internal Medicine MOU had been approved. In addition, the letter noted that "all payments are based on the CHAMPUS allowable charge methodology; payment for a procedure will not exceed the area prevailing charge." Similarly, the letter indicated that

"Partnership claims will be processed in the same manner as CHAMPUS claims and are subject to program and policy limitations.... Payments may not exceed the CHAMPUS prevailing fees."

TMM entered into two other MOUs with the Army: a Primary Care MOU, executed June 7, 1989, and a Pediatric Care MOU, executed August 28, 1990. Both contained the same provisions regarding the "current CHAMPUS prevailing rate" billing rate; both were executed after the addition of the MEI reimbursement limitation to the CHAMPUS regulation.

In 1990, the Associated Group began reimbursing TMM according to the limitation imposed by the use of the MEI. On February 22, 1990, TMM sent a letter to Colonel James Henry, the Commander at the Fort Knox hospital, reporting that the MEI had been used in determining the amount that TMM was reimbursed for certain medical services. TMM pointed out that the Internal Medicine MOU called for reimbursement based upon "75% of the current CHAMPUS prevailing rate" and made no mention of the use of the MEI to limit payments.

Colonel Henry conveyed TMM's concern to the Army Health Services Command. In his letter, Colonel Henry sought clarification regarding the MEI limitation. The Associated Group prepared a response and sent it to CHAMPUS on May 10, 1990. This response indicated that the payments made by the Associated Group were in accordance with the MEI limitation in the CHAMPUS regulations. CHAMPUS then sent a response to the Army.

TMM and the Army re-executed the Primary Care and Pediatric Care MOUs at the end of each of the initial two year terms and re-executed the Internal Medicine MOU in February of 1991. The re-executed contracts were silent as to the MEI limitation. On February 22, 1991, the Associated Group sent a letter to TMM stating:

Per the agreement, the reimbursement of your Partnership claims will be based on a single percentage of the profiled amounts (the prevailing charge or the maximum allowable prevailing charge (also called the Medicare Economic Index adjusted pre-

vailing charge), whichever is lower). You may continue to bill your usual charge for each procedure. We will automatically calculate the negotiated percentage of the profiled amounts and reimburse you at the percentage of each procedure's profiled amount, or the billed charge, if lower.

Similar letters were sent in response to the other re-executions.

## PROCEDURAL HISTORY

On April 10, 1992, TMM sent a claim under the Contract Disputes Act ("CDA") for $52,746.28 to Colonel Thomas Clements at Ireland Army Community Hospital. This amount was calculated as the difference between the actually reimbursed MEI rate and TMM's calculation of the contract rate. Colonel Clements responded: "Please be advised that I am not now nor have I ever been a contracting officer." The response also asserted that the MOUs were not properly subjects of a CDA claim.

TMM filed a complaint against the government in the Court of Federal Claims on December 8, 1992. The government moved for dismissal for lack of subject matter jurisdiction, RCFC 12(b)(1), arguing that (a) no contract existed, and (b) the claim was not properly brought under the CDA. The motion was denied on September 23, 1993. *Total Med. Management, Inc. v. United States*, 29 Fed.Cl. 296 (1993). As to the first of the government's arguments, the trial court reasoned:

In this case, defendant, while implicitly acknowledging that plaintiff has alleged a contract, challenges the contract's existence. This is a challenge to the truth of the allegations, not to their sufficiency.... [S]uch a challenge is a merits question not amenable to resolution under a motion to dismiss for lack of jurisdiction.

*Id.* at 299–300. The court concluded that "a contract was properly pleaded, and we have jurisdiction to address the merits." *Id.* at 301. As to the second argument, the trial court stated:

Defendant does not dispute that a properly certified claim was filed, but rather maintains that the hospital commander who

received it was not an authorized contracting officer. While the proper submission of a certified claim to a contracting officer is a jurisdictional requirement, it is clear in this instance that defendant's contention that there was no authorized contracting officer to whom the claim could be submitted is predicated on the theory that no contract existed. Assuming that a contract existed here, it would plainly be covered by the CDA as a contract for services. As explained above, the existence of a contract is a question which cannot be disposed of at this juncture.

*Id.* As stated by the trial judge, the two arguments presented by the government are essentially the same: that there was no enforceable contract.

On July 11, 1994, the parties filed cross-motions for summary judgment on the issue of liability. On November 2, 1994, the trial court granted TMM's summary judgment motion and denied the government's motion. In a ruling from the bench, the trial judge held that liability turned on the meaning of the term "current CHAMPUS prevailing rate" used in the MOU. The judge agreed with TMM that this was the same as the "current CHAMPUS prevailing charge" as used in 32 C.F.R. § 199.14 (1990), rather than the "allowable rate," which, under the CHAMPUS regulations, would have included the MEI limitation.

On May 22, 1995, the government moved to suspend proceedings to provide further briefing on the argument that the MOUs were not enforceable contracts and requested leave to file a motion to dismiss for failure to state a claim upon which relief could be granted. This motion was denied on May 24, 1995 because of the prior disposition of all liability issues on summary judgment. A motion for reconsideration was denied on June 19, 1995.

### DISCUSSION

■ The Tucker Act limits the jurisdiction of the Court of Federal Claims to

any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1994). Although the government argues that jurisdiction is lacking because there was no enforceable contract, the law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven. *Spruill v. Merit Sys. Protection Bd.*, 978 F.2d 679, 686 (Fed.Cir.1992); *Gould, Inc. v. United States*, 67 F.3d 925, 929 (Fed. Cir.1995). There is no question that TMM pleaded the existence of a valid contract here. The proper question, despite the government's label, is one of the merits: whether TMM failed to state a claim upon which relief can be granted. *Id.*

■ The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract. *Thermalon Indus., Ltd. v. United States*, 34 Fed.Cl. 411, 414 (1995) (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990) and *Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982)). In addition, government contracts must comply with statutorily sanctioned regulations. *See, e.g., United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed.Cir.1986) (holding that a procurement contract award in conflict with statute and regulation was void *ab initio* ). A contract which is "plainly illegal" is a nullity and void *ab initio. John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438, 440 (1963). A contract is "plainly illegal" when made contrary to statute or regulation either because of some action or statement by the contractor, or when the contractor is on "direct notice that the procedures being followed were violative of such requirements." *Amdahl,* 786 F.2d at 395 (quoting a decision of the Comptroller General, B–176393, 52 Comp. Gen. 214, 218 (1972) (citing *Schoenbrod v. United States*, 187 Ct.Cl. 627, 410 F.2d 400 (1969))).

■ Here, the existence of the negotiated, signed MOUs evidences offer and acceptance. There was also consideration in the mutuality of obligation: TMM is to provide discounted health care services; the Army is to provide support staff and free space in the military hospital.

■ The Contract Disputes Act defines a contracting officer as:

> any person who, by appointment in accordance with applicable regulations, has the authority to enter into and administer contracts and make determinations and findings with respect thereto. The term also includes the authorized representative of the contracting officer, acting within the limits of his authority.

41 U.S.C. § 601(3) (1994). The Secretary of Defense has authority to enter into resource sharing "agreements" with civilian health care providers. 10 U.S.C. § 1096 (1994). In Department of Defense Instruction 6010.12, the Secretary authorizes hospital commanders to administer the partnership agreements and to encourage civilian health care providers to participate in them. Hospital commanders may execute an agreement only after submitting it for approval to the Director, CHAMPUS, and the Surgeon General of the appropriate military department. Department of Defense Instruction 6010.12(F)(1). The MOUs here were forwarded to the Associated Group, the CHAMPUS approval designee, and were approved. Therefore, we hold that the MOU was ratified by a government representative with the authority to bind the United States in contract. Thus, we hold all elements for a contract were met by the MOUs.

■ The government makes several arguments that the MOUs are generally unenforceable, none of which we find persuasive. For instance, the government argues that we should follow the Court of Federal Claims holding in *Trauma Service Group, Ltd. v. United States*, 33 Fed.Cl. 426 (1995), *appeal docketed*, No. 95–5129 (Fed.Cir. July 14, 1995), that CHAMPUS MOUs are unenforceable agreements because they set forth no remedy for breach, do not demonstrate definitively the government's intent to be bound, and contain no method for determining a breach. The general rule is that, to be binding, a contract must be "sufficiently definite to permit determination of breach and remedies." *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed.Cir.1992). Here, the government has not made a convincing argument that the MOUs are so indefinite as to preclude determination of breach and remedies. To the contrary, the obligations of the parties are clear: TMM is to provide discounted medical services; the hospital is to provide free space and support staff and to encourage dependents to use TMM's services. The CHAMPUS regulatory scheme provides payment details. The determination of damages or specific performance would flow naturally from a breach of these duties.

■ The government also argues that the resource sharing agreements are not contracts because they are not labeled "contracts" in the regulatory scheme. However, the failure of Congress to use the word "contract" does not preclude the holding that a binding contract is formed. *See, e.g., Thermalon*, 34 Fed.Cl. at 415 (holding that National Science Foundation "research grant" is a binding contract).

■ Finally, the government argues that, if contracts, the MOUs are not subject to the Contract Disputes Act, 41 U.S.C. § 602(a), because they are not procurement contracts for the benefit of the government. The government argues that the MOUs are solely for the benefit of the military dependents who receive the medical care. We reject this argument since it is clear that the government has legal obligations to military dependents and benefits by obtaining said dependents' care at a reduced cost.

■ However, even though the basic requirements for a government contract are met, the contract is void because the MOUs are in direct conflict with CHAMPUS regulations. This regulatory scheme in effect at the time each of the contracts was entered into (or renewed), explicitly limited health care provider reimbursement base rates to the lowest of three possibilities: the billed charge, the prevailing charge, or the MEI limited prevailing charge. 32 C.F.R.

§ 199.14(g)(1) (1990). Neither the Secretary of Defense nor any of his designated representatives had the authority to obligate CHAMPUS beyond these base rates set by regulation. The government "is not bound by its agents acting beyond their authority and contrary to regulation." *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir.1983) (quoting *Yosemite Park & Curry Co. v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558 (1978)); *see also Office of Personnel Management v. Richmond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990) (agencies' unauthorized statements to citizens cannot obligate the Treasury for the payment of funds). A contractor who enters into an arrangement with an agent of the government bears the risk that the agent is acting outside the bounds of his authority, even when the agent himself is unaware of the limitations on his authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

Furthermore, the illegality was "plain" under the *Reiner* test. 325 F.2d at 440. TMM was on constructive and actual notice that the CHAMPUS regulatory scheme would be used in determining payment rates. Each of the MOUs was either entered into or renewed after the new regulatory reimbursement scheme went into effect. Also, the Associated Group informed TMM in their approvals of the MOUs that "CHAMPUS allowable charge methodology" would be used in determining reimbursement rates. Since the contracts were "plainly illegal," they were void *ab initio.* A dismissal on this basis is one for failure to state a claim. *Gould,* 67 F.3d at 930.

Since the MOUs were void *ab initio,* TMM failed to state a claim upon which relief can be granted. We therefore reverse and remand with instructions to dismiss for failure to state a claim.

*REVERSED AND REMANDED.*

COSTS

Each party to bear its own costs.