**MPE BUSINESS FORMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–100 C.

United States Court of Federal Claims.

July 29, 1999.

---

**20.** *See* Plaintiff's Reply at 14 n. 1 (deposition testimony of Mr. Caruk).

Frederic G. Antoun, Jr., Chambersburg, PA, counsel of record for plaintiff

R. Alan Miller, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were David G. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; Kathryn A. Bleecker, Assistant Director; and Thomas T. Kelly, United States Government Printing Office, of counsel.

### OPINION

DAMICH, Judge.

This case is before the Court based on cross motions for summary judgment based on the administrative record and review of a decision in *MPE Business Forms, Inc.*, GPO BCA 10–95 (Aug. 16, 1996) [hereinafter "Decision"]. The case concerns the definition of the term "copy," in context of a contract that provides for payment per "copy." For example, when a form comprised of three sheets is reproduced, should the printer be paid for one copy or three copies?

### FACTS

The facts are straightforward and relatively easy to understand. The Plaintiff, MPE Business Forms, Inc. ("MPE"), submitted the lowest bid[1] under an invitation for bid issued by the Government Printing Office ("GPO"). Under this contract, MPE was to provide laboratory reports for the General Services Administration and the Department of Veterans Affairs. The laboratory reports

---

1. Its bid was only about $1,000.00 less than the competitor whose bid was second lowest. See Decision, page 16.

are forms that consist of two and three parts, which are known in the printing industry as "snap sets."

The disputed language comes from the section on pricing the bids. The contract states:

COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations necessary for the complete production and distribution (except as specified in item II) listed in accordance with these specifications.

Films will be furnished on the majority of orders.

| | Black Ink or a Color Other than Black | | Each additional Color of Ink | |
| --- | --- | --- | --- | --- |
| | Makeready and Setup Charges (1) | Per 1,000 Copies (2) | Makeready and Setup Charges (3) | Per 1,000 Copies (4) |
| (a) 2–part sets | $___ | $___ | $___ | $___ |
| (b) 3–part sets | $___ | $___ | $___ | $___ |

R4 File, Tab A, at 11. See Decision, page 10. The disputed language is what "Copies" means in the context of prices "per 1,000 Copies."

---

Because the contract officer had not had experience with MPE before, the contract officer discussed the terms of the contract with the company's president. The contract officer felt comfortable that there was an agreement on how the contract was to be billed. MPE's president also believed that the parties agreed on how the contract was to be billed. Based upon the apparent agreement, the GPO awarded the contract for fiscal year 1995 Program D201–S to MPE.

After the Plaintiff started performing the contract, the parties disputed how the contractor could charge the government. Essentially, the contract officer[2] determined that a form that contained either two or three sheets was a single "copy." The Plaintiff, unsuccessfully, claimed that a form with three pages required three "copies." Despite the dispute, the Plaintiff continued to perform, while losing money, to avoid the consequences of defaulting on a government contract.[3]

The Plaintiff challenged the decision of the contract officer to the Board of Contract Appeals for the Government Printing Office (Board). The Board ruled in favor of the government. The Plaintiff, thereafter, filed the present case in the Court of Federal Claims. Because the facts are not disputed, both parties filed a motion for summary judgment.

**Standard of Review**

[A] contract with the GPO is not subject to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613. This is so because the CDA applies to contracts entered into by *executive* agencies, 41 U.S.C. § 602(a), whereas here the GPO is not such, but rather is an agency of Congress.... Nev-

2. This contract officer had replaced the previous contract officer who had reviewed the contract with a representative of MPE.

3. The Board notes that representatives from the Plaintiff testified that it requested the government to terminate the contract for convenience. See Transcript, Vol. I, page 56 (testimony of Twyla S. Edwards) and Transcript, Vol. I, page 213–24 (testimony of Thomas R. Edwards). The contract officer testified that he did not recall this request for termination. See Transcript, Vol. II, page 29 (testimony of Jack Scott). Decision, page 26, note 32.

ertheless, the Claims Court has jurisdiction over this case, inasmuch as plaintiff seeks money damages for breach of an express contract with the United States, under the Tucker Act, 28 U.S.C. § 1491(a)(1). This court will, therefore, review the Board's decision under Wunderlich Act standards.

*Fry Communications, Inc., v. United States,* 22 Cl.Ct. 497, 502–03 (1991) (Citations omitted).

The Wunderlich Act states:

No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, That any such decision shall be final conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

41 U.S.C. § 321.

"No government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board." 41 U.S.C. § 322.

These two statutes establish a two-tiered system of judicial review for decisions by administrative boards. First, factual determinations are conclusively binding on the district court unless they are shown to be fraudulent, capricious, arbitrary or lacking substantial evidence. Second, legal issues are reviewed under a de novo standard. See *Granite Const. Co. v. United States,* 962 F.2d 998, 1001 (Fed.Cir.1992).

The Board's decision requires careful examination. It begins by clearly reciting the facts, including the terms of the contract that are in issue. The Board turns to a central question in the case, whether the contract is ambiguous, and sets forth various means to determine whether "copy" in this contract is ambiguous. The Board also explains what happens if the contract is ambiguous and describes the latent/patent distinction. The section on latent and patent ambiguity is technically unnecessary because the Board "holds" that the contract is not ambiguous and finds that the terms are clear in the government's favor. Using a "belt and suspender" approach, the Board also "finds" that the government prevails even if the contract were ambiguous because any ambiguity was patent. The Board may have felt obligated to address whether any ambiguity was patent or latent because the parties briefed that issue. Thus, the Court understands the Board's desire to respond to the parties' arguments even when the Board's answer is superfluous. Cf. *Massie v. United States,* 166 F.3d 1184 (Fed.Cir.1999) (holding the contract was not ambiguous and also stating that any ambiguity was latent).

The Board, however, goes far beyond what is necessary to its holding and beyond the issues that the parties briefed. After analyzing the various permutations of ambiguity, the Board *on its own initiative* addresses whether a contract was formed. The Board "finds" that the parties did not have a meeting of the minds. Therefore, no *express* contract was formed. Having created a conundrum, the Board then "finds" that there is a contract implied in fact. (The Board correctly notes that it could not find a contract implied in law.) Based upon this implied-in-fact contract, the Board then "remands" to the parties for an award of quantum meruit. This aspect of the Board's decision warrants the Court's scrutiny.

### Implied–in–Fact Contracts

Before addressing whether the contract was ambiguous, the Court believes it is necessary to comment briefly on the Board's long digression about implied-in-fact contracts.[4] There are three significant flaws in the Board's legal analysis. Although strictly unnecessary to resolving the case at hand,

---

**4.** The parties have agreed that the Board's discussion about implied-in-fact contracts was dic-

ta. The Court agrees with this assessment.

the Court believes it is important to discuss them: (1) whether an implied-in-fact contract could be found, (2) whether quantum meruit is the proper measure of recovery, and (3) assuming quantum meruit is the proper measure of recovery, whether the Board correctly applied it in this case.

An implied-in-fact contract arises when, in the absence of an express contract, the parties' behavior leaves no doubt that what was intended was a contractual relationship permitted by law. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997). Further, the same elements of express contracts, such as mutuality of intent and *lack of ambiguity in offer and acceptance* are required in implied-in-fact contracts. See *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289, 295 (1987).

Here, even under the Board's analysis, a finding of an implied-in-fact contract seems highly problematic if the parties did not reach a meeting of the minds on price. If the parties did not reach an express agreement with regard to price, then how could the parties have reached an *implied* agreement?

The authorities cited in this part of the Board's decision (pages 75–80) are unsatisfactory. The Board relies heavily on *Western States Construction Co.*, 72–2 BCA ¶ 9508 at 44,302, 1972 WL 1406. In *Western States*, the Board ordered that the contract was made according to the contractor's last offer, which was the Defendant's price ($1,098,300) *plus* certain other costs. In *Western States*, there was no ambiguity of terms, only a disagreement about those terms. *Western States*, therefore, does not stand for the precedent that an implied-in-fact contract should be found when the express contract contains ambiguous terms.

In *Publishers Choice Book Mfg. Co.*, GPOBCA 4–84, 1986 WL 181457, another

case on which the Board relied, the Board found that the contract was *not* ambiguous. The Board, without any citation to legal authority whatsoever, determined that the contractor was entitled to quantum meruit recovery. *Publishers Choice* is an unpersuasive precedent.

Moreover, the cases that establish that implied-in-fact contracts must have definite terms actually hold that no implied-in-fact contract existed. See *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289, 295 (1987); *Tree Farm Corp. v. United States*, 218 Ct.Cl. 308, 585 F.2d 493, 500 (1978); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474, 481–82 (1976). Therefore, the Board's determination that an implied-in-fact contract existed seems doubtful.

The second legal point from the Board's decision that needs attention is whether quantum meruit is appropriate as a measure of damages. In *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986), the Federal Circuit considered two measures of damages: by one theory, the contractor is entitled to recover "on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity"; by the other theory, the contractor is entitled to "the cost of performance plus a reasonable profit on those costs whether or not benefit accrued to the government".

As a precedent, *Amdahl*, however, is questionable. This Court may lack the authority to award recovery in quantum meruit, which usually follows a contract implied at law. See *Hercules, Inc. v. United States*, 516 U.S. 417, 423–24, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996). Whether quantum meruit is permitted as a form of recovery remains undecided. *Frank & Breslow, LLP v. United States*, 43 Fed.Cl. 65, 69 (1999).[5]

---

**5.** *Frank & Breslow* relied on *American Telephone & Telegraph Co. v. United States*, 124 F.3d 1471, 1479 (Fed.Cir.1997), *rev'd en banc*, 177 F.3d 1368 (Fed.Cir.1999). The panel of the Federal Circuit stated that "[a]s a general rule, it [quantum meruit] falls outside the scope of relief available through the Court of Federal Claims." After consideration *en banc*, the Federal Circuit reversed its panel decision in a split decision.

The majority opinion of the en banc decision noted that when a performed contract is in violation of the law, the courts have "allowed recovery under an implied contract theory." *Id.*, 1376. The Federal Circuit, however, did not instruct on the proper measure of damages.

The last issue from the Board's digression on implied-in-fact contracts and quantum meruit is the amount of damages. The amount of recovery was to be "not less than the next lower bid price or contract then in being, nor more than the next higher bid price, as applicable." See Decision, page 79. Under the quantum meruit principles established in *Amdahl,* the award should be based on either (1) the value of the services received by the government or (2) cost of performance by the contractor plus reasonable profit. Neither of these principles involve considering the value of the competing bids. In recommending a scope of recovery to MPE, the Board failed to follow *Amdahl.*

Accordingly, the Board's discussion of quantum meruit is not only unnecessary (because it does not relate to whether the contract is ambiguous) but also wrong (because of the three reasons described above). Having clarified the Board's errors in the course of its digression, the Court now turns to the main issue: was the Board correct when it decided the contract unambiguously states that "copy" means per "set".

**Is the contract ambiguous?**

■ "The issue of ambiguity is 'a question of law for the court to decide.' *John C. Grimberg Co., Inc. v. U.S.,* 7 Cl.Ct. 452, 456 (1985)." *Shearson Lehman Hutton, Inc. v. United States,* 24 Cl.Ct. 770, 773 (1991), *aff'd,* 983 F.2d 1086, 1992 WL 321020 (Fed.Cir. 1992). As a question of law, this Court reviews the decision (that the contract was ambiguous) of the Board de novo.

■ "When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity.... To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term.... Rather, both interpretations must fall within a 'zone of reasonableness.' " *Metric Constructors, Inc. v. National Aeronautics and Space Adminstration,* 169 F.3d 747, 751 (Fed.Cir.1999).

■ In determining whether the contract is ambiguous, the Court must confront what evidence to consider in making that decision. Phrased differently, is the Court limited to only the four corners of the con-

tract? Fortunately, *Metric Constructors, supra,* which endorsed the opinion in *Western States Const. Co. v. United States,* 26 Cl.Ct. 818 (1992), instructs this decision-making process. "Before an interpreting court can conclusively declare a contract ambiguous or unambiguous, it must consult the context in which the parties exchanged promises." *Metric Constructors, supra,* 169 F.3d at 752. "The commentaries agree that the courts should use evidence of trade practice and custom not only to determine the meaning of an ambiguous provision, but to determine whether a contract provision is ambiguous in the first instance. See, e.g., Restatement (Second) of Contracts § 220 cmt. d (1981)." *Id.,* at 753.

Like the Board, the Court is called upon to resolve the definition of the word "copy" used in the "COMPLETE PRODUCT" specification of the "Schedule of Prices." Like the Board, the Court finds that "copy" is unambiguous. Unlike the Board, however, the Court finds that MPE's interpretation is correct.

■ *Metric Construction* emphasizes that the context in which a contract is made is significant in determining whether the contract is ambiguous. The record in this case shows the context in which the parties dealt with each other. The contract before this contract was based on payment "per 1,000 sets." In 1994, the General Terms, Conditions and Specifications indicate revision from "running per 1,000 sets" to "Per 1,000 Copies." Rule 4 File, Tab A, page 11. The change in the wording presumptively changes the meaning. See *Taracorp, Inc. v. NL Industries, Inc.,* 73 F.3d 738, 744 (7th Cir.1996); *Consolidated Gas Supply Corp. v. FERC,* 745 F.2d 281, 287 (4th Cir.1984); Cf. *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1367 (Fed.Cir.1998) (stating "a change in the language of a statute is generally construed to import a change in meaning."). This presumption, although rebuttable, is especially strong because the government highlighted the change: "These specifications have been extensively revised; therefore, all bidders are cautioned to familiarize themselves with all provisions of these

specifications before bidding." R4 File, Tab A, page 1.

Given the change in wording, MPE reasonably relied on industry standards. Thomas R. Edwards, the person who prepared the initial bid for MPE, testified that he saw the change and knew how the industry defined both "sets" and "copies." See Transcript, Vol. II, pages 110–12, cited in Decision, page 14, note 13. MPE, therefore, could presume that the change had *some* significance—otherwise the change would have been unnecessary.[6]

The industry standard shows that "copies" and "sets" are *not* synonymous.[7] The *Business Forms Glossary*, a publication of the National Business Forms Association and the International Business Forms Association, states " 'copy' can be a synonym for *part* or *ply*. (Please see that definition.)" Exhibit A13, page 20. A "part," in turn, is defined as "one ply or copy within a unit set or continuous form." Exhibit A13, page 62. The *Business Forms Handbook* defines a "unit set" as a "loose or bound carbonless, carbonized, or carbon-interleaved form with an original and one or more copies, with or without stubs, not in a continuous form." Exhibit A1, page 121.

In addition to this documentary evidence, MPE also presented the testimony of three experts.[8] These people testified that copies and sets differ in meaning. See Transcript, Vol. 1, pages 26–33, 64 (testimony of Twyla S. Edwards, MPE's Vice President); Transcript, Vol. 1, pages 99–104 (testimony of Thomas R. Edwards, MPE's Vice President of Sales and Marketing); and Transcript, Vol. 1, pages 205–206, 221–222 (testimony of Robert McCall).

Because of the trade usage [9] and the change in specifications from one contract to the next, the Plaintiff reasonably interpreted "copy" to mean "part," not "set." This leads to a question of whether the Defendant reasonably interpreted "copy" to mean "set," not "part."

The Defendant argues that when "copy" is interpreted in the context of the entire contract, its meaning as "set" is apparent.[10] The Defendant advances three principal arguments to support its claim that the contract should be interpreted according to its reading. They are: (1) the contract should be interpreted as a whole; (2) the contract language is clear; and (3) MPE is bound by its actions when it interpreted "copies" to

---

6. The Board glances over the change in the language. According to the Board, "there is nothing in the record to indicate why the change from 'sets' to 'copies' was made muchless [sic] who authored it." Decision, page 52.

In doing so, the Board seems to be giving more deference to the government's interpretation than is appropriate. The contract is interpreted from the standpoint of the reasonable contractor. *H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir.1998); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 917 (Fed. Cir.1984). A reasonable contractor would not be concerned with who authored the change. In addition, as explained in the text, a reasonable contractor is entitled to presume that a change in language is meaningful.

7. The Board rejected the Plaintiff's argument about "trade usage" because the Board believed that evidence of trade usage is only considered when the contract fails to define the term. See Decision, page 54. As discussed in the main text, *Metric Constructors, Inc. v. National Aeronautics and Space Administration, supra,* 169 F.3d 747, shows that the Board should have evaluated this evidence. Therefore, because the

Board erred in how it considered the evidence before it, the Board's factual findings are entitled to less deference.

8. The Board accepted that these people were qualified as experts. See Decision, page 49, note 45. This Court will defer to the Board's finding. See *Acoustical Design, Inc. v. Control Electronics Co.,* 932 F.2d 939, 942 (Fed.Cir.1991).

9. The Board rejected the government's attempt to contradict MPE's claim about "trade usage." See Decision, p. 50, note 47; see, also, Decision, p. 64, note 55. Whether to accept or to reject evidence of trade usage is a question of fact. See *Capitol Converting Equipment, Inc. v. LEP Transport, Inc.,* 965 F.2d 391, 395 (7th Cir.1992) (applying Illinois law); *D & S Universal Mining Co., Inc. v. United States,* 4 Cl.Ct. 94, 97 (1983). Under the reviewing authority of this Court as set forth by the Wunderlich Act, the Court will not examine this finding.

10. In conjunction, the government argues that the Court cannot consider "trade usage." *Metric Constructors* has resolved this argument against the government.

mean "sets." Although accepted by the Board,[11] these arguments are unconvincing.

Both the Defendant, in its briefs to this Court, and the Board, in its decision, state the familiar principle that contracts should be interpreted to give meaning to all terms and that no term should be rendered meaningless or superfluous. See, e.g., *Gould v. United States*, 935 F.2d 1271, 1274 (Fed.Cir. 1991); *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985). The Board states that to interpret "copies" as proposed by MPE "would 'eviscerate' the entire contractual scheme." Decision, page 63. The Board, however, fails to explain its logic in reaching this legal conclusion. In the Defendant's reply brief, the United States develops this argument a bit more. According to the Defendant, if "copies" means "parts," then there is no need for the contract to define "parts," as it does.

The Court disagrees with the Defendant's argument. In several places, the contract uses the term "parts." "The printing on each part must be properly aligned so that the printing on each form will coincide when the forms are gathered into sets. The forms on all parts must register with ± 1 mm (½")." Decision, page 55. Under the "BINDING" heading, the contract states "(2) Forced gumming is defined as attaching the sets at the stub by adhesive applied to the edge and penetrating between parts and carbons after the sets have been assembled." Decision, page 55. In these places, the contractor would look to the definition of "parts" in Section Two of the contract to determine the meaning. Thus, the definition has a meaning even when "copy," in the context of the "COMPLETE PRODUCT" section means "parts." The Defendant's argument on this point is unpersuasive.

The Defendant's second argument is that the contract language is clear. To support its position, the Defendant repeats its claim that the definition of "parts" is meaningful. The Defendant, by citing *Haehn Management Company v. United States*, 15 Cl.Ct. 50, 59 (1988), also argues that custom and trade usage are to be considered only to explain ambiguous terms. As explained above, the Federal Circuit in *Metric Constructors, Inc. v. National Aeronautics and Space Adminstration, supra*, 169 F.3d 747, has settled this argument against the Defendant. Finally, the Defendant also argues that the "COMPLETE PRODUCT"[12] specification requires that "copies" means "sets." The Defendant suggests that MPE, by submitting a bid for 1,000 parts of a three-part set, has agreed to produced 333 and ⅓ sets. The Defendant says this result is "absurd."

The Court does not agree with the Defendant's argument. When "copies" means "sets," the language in the "COMPLETE PRODUCT" specification does *not* lead to an absurd result. The United States could order as many *sets* as it wished. The "set," as a "complete product," includes either two or three parts plus additional materials such as binding and carbons. The price "per set" depends on the number of parts in the set. If the United States placed an order for 1,000 sets that contained three parts, MPE expected to charge the government (and to have the government pay) $27,690.00 ($9.23 per part X 3 parts X 1,000 sets). The government would receive a "COMPLETE PRODUCT" of 1,000 sets, not a fraction of a set. The results would not be "absurd."

The Defendant offers a third and final argument for finding that the contract clearly means "sets" when the contract uses the term "copies." The Defendant argues that during performance, MPE interpreted "copy" to mean "set" when it produced random "copies" for quality control.[13] When

---

11. See Decision, pages 48–64.

12. This section states: "COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations necessary for the *complete production and distribution* (except as specified in Item II) listed in accordance with these specifications." Decision, page 10.

13. "DEPARTMENTAL RANDOM COPIES (BLUE LABEL): All orders must be divided into equal sublots in accordance with the chart below. A random copy must be selected from each sublot. Do not choose from the same general area in each sublot. The Contractor will be required to execute a statement furnished by GPO certifying that copies were selected as directed. The random copies constitute a part of the total quantity ordered, and no additional charge will be allowed." Decision, page 8.

MPE complied with this requirement during performance, MPE submitted entire sets. See Transcript, Vol. 1, page 224.

The Defendant takes a general principle too far. Although one term is usually interpreted identically in a contract, that rule is not absolute.[14] Instead, the context of the usage matters. Within the context of the requirement to produce random "copies" for quality control, "copies" means sets. Within the context of the pricing clause, a different definition is entirely possible. *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1115–16 (Fed.Cir.1991). Accordingly, MPE's interpretation of how it could comply with the random sample requirement does not control how the price clause must be interpreted.

The Defendant fails to respond to MPE's most persuasive argument—the change in the language from "sets" to "copies." The Defendant points out that the Court should define language according to the meaning given to the language by a reasonably intelligent person familiar with the circumstances. *Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965). Here, the significant circumstance is that the United States *changed the language explaining how the contract was priced.* A reasonably intelligent person would understand that "copies," in the context of the bidding, could not mean "sets." Therefore, "copies" must mean "parts."

### CONCLUSION

The Court holds, as a matter of law, that "copies" means "parts." Plaintiff's motion for summary judgment is GRANTED. Defendant's motion for summary judgment is DENIED. The case is remanded to the Board for consideration of damages accord-

ing to the Court's interpretation of the contract. See *Granite Constr. Co. v. United States*, 962 F.2d 998, 1008 (Fed.Cir.1992); *Teledyne Lewisburg v. United States*, 699 F.2d 1336, 1360 (Fed.Cir.1983).

---

**14.** Here, this rule *cannot* be absolute because "copy" is used with several different meanings. The Board noted:

[T]he disputed contract uses "copy" (or its plural, "copies") at least three acceptably defined ways: (1) in its traditional *graphic arts* sense, namely, as something used in the production of printing (popularly called an "original"); e.g. *camera copy* ("GOVERNMENT TO FURNISH" specification); (2) as describing the duplicate of a printed original; e.g. *random sample copies* for the purposes of qualify control ("GOVERNMENT TO FURNISH," "DEPARTMENTAL RANDOM COPIES (BLUE LABEL)," and "QUALITY ASSURANCE RANDOM COPIES" specification), "legible copies" ("INTERVENING CARBONS" specification); and (3) in its *trade or forms industry* sense as another word for "part," "ply" or "leaf"; e.g. "Copy designations (part-to-part changes)" ("PRINTING" specification), and "duplicate copies (parts 1 and 2)," ("BIDDER'S NAME AND SIGNATURE" block). Decision, page 52–53.