**ALLIED HOME MORTGAGE CAPITAL CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 10–66C.

United States Court of Federal Claims.

Nov. 11, 2010.

Robert Wayne Bond, Womble Carlyle Sandridge & Rice, PLLC, Atlanta, GA, for the plaintiff.

Courtney Sheehan McNamara, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With her were Jeanne E. Davidson, Director, Commercial Litigation Branch, and Tony West, Assistant Attorney General, Civil Division.

## OPINION

HORN, Judge.

Before the court is the government's motion to dismiss the complaint filed by plaintiff Allied Home Mortgage Capital Corporation (Allied). The plaintiff states in its complaint that it seeks "recovery of amounts owed under a Contract and approved Liquidation Plan entered into between Allied and the United States Department of Agriculture ('USDA')," or, alternatively, recovery under the theory of *quantum meruit*. The defendant argues, however, that this court should dismiss the complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) (2010), for lack of subject matter jurisdiction, based on the provisions of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub.L. No. 103–354, 108 Stat. 3178 (codified at 7 U.S.C. § 6901, et seq. (2006)) (the Reorganization Act). The defendant argues that pursuant to the Reorganization Act and the enabling regulations, 7 C.F.R. § 11.1, et seq. (2010), United States District Courts possess exclusive jurisdiction to entertain claims, such as those presented by plaintiff Allied, which arise from participation in a loan guarantee program administered by the USDA's Rural Development division. According to the defendant, the claims presented by the plaintiff are nothing more than a dispute "involving the USDA's RD [Rural Development] division's loan note guarantee programs." Moreover, the defendant argues that the plaintiff was first required to exhaust administrative remedies at the USDA, through the agency's mandatory appeals process, including a review by the USDA National Appeals Division (NAD), before filing a complaint in a federal District Court. Defendant asserts that jurisdiction to review a decision by the NAD is available only in the appropriate United States District Court, not in the United States Court of Federal Claims. Finally, defendant argues that plaintiff's case does not present the necessary, limited circumstances pursuant to which *quantum meruit* relief may be granted in the United States Court of Federal Claims.

In its response to the defendant's motion to dismiss, plaintiff argues that the Liquidation Plan entered into by Allied and the USDA is a "separate" contract which includes an agreement to reimburse Allied for expenses incurred while carrying out the Liquidation Plan. Allied, therefore, claims that jurisdiction to review plaintiff's claims is proper in the United States Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006). Plaintiff also asserts its right to recover in the Court of Federal Claims based on *quantum meruit* for services performed.

## FINDINGS OF FACT

In the complaint filed in this court, plaintiff states that it is "in the real estate mortgage business and participates in USDA-approved loan programs throughout the United States." According to the complaint, in early 2003, the plaintiff became the servicer of a real estate development project known as the Blues Alley Project, involving the construction of lower-income, multi-family housing in Clarksdale, Mississippi (the Project). The Project was funded by bonds, the proceeds of which were held in trust by Wells Fargo Bank and were loaned to the borrower and developer of the Project, Blues Alley Estates, L.P. (Blues Alley), to complete the Project. The USDA subsequently repurchased the loan from Wells Fargo. The USDA guaranteed a large portion of the loan for the Project through the Rural Housing Service program administered by the USDA's Office of Rural Development.

Allied signed and entered into a "Lender's Agreement" with the USDA, by which Allied was "approved to process and request Loan Note Guarantees and to service those loans as authorized herein and under 7 C.F.R. part 3565." The plaintiff described its role in the Project as to "service the loan" and to ensure that USDA requirements were satisfied. Selected text from the Lender's Agreement is instructive and explicitly covers how Allied, as the lender, should proceed in the event of a failing or failed project, including submission of a Liquidation Plan. The Lender's Agreement also specifically refers to and incorporates 7 C.F.R. Part 3565, titled "Guaranteed Rural Rental Housing Program." The Lender's Agreement states in part:

**VII. Liquidation**

If the Lender concludes pursuant to Government regulations that liquidation of a guaranteed loan account is necessary because of one or more defaults or third party actions that a Borrower cannot or will not cure or eliminate within a reasonable period of time, liquidation may be considered. If the Lender concludes that liquidation is necessary, it must request the Government's concurrence. When the Government concurs with the Lender's conclusion, or at any time concludes independently that liquidation is necessary, it will notify the Lender and the Lender will liquidate the loan unless [the] Government, at its option, decides to carry out liquidation.

A. *Lender's proposed method of liquidation.* Within 30 days after the decision to liquidate, the Lender will advise the Government in writing of its proposed detailed method of liquidation ("liquidation plan") and will provide the Government with:

1. Such proof as the Government requires to establish the Lender's ownership of the guaranteed loan promissory notes and related security instruments;

2. Information lists concerning the property's assets including real and personal property, fixtures claims, contracts inventory accounts receivable, personal and corporate guarantees, and other existing and contingent assets and advice as to whether or not each item is serving as collateral for the guaranteed loan;

3. A proposed method of making the maximum collection possible on the indebtedness; and

4. If the outstanding principal loan balance including accrued interest is less than $200,000, the Lender will obtain an estimate of the market and potential liquidated value of the collateral. On loss balances in excess of $200,000, the Lender will obtain an independent appraisal report on all collateral securing the loan, which will reflect the current market value and potential liquidation value.... The appraisal report is for the purpose of permitting the Lender and the Government to determine the appropriate liquidation actions.

B. The Government will inform the Lender in writing whether it concurs in the Lender's liquidation plan. Should the Government and the Lender not agree on the Lender's liquidation plan, negotiations will take place between the Government and the Lender to resolve the disagreement. The Lender will ordinarily conduct the liquidation; however, should the Government determine that it will conduct the liquidation, the parties will proceed as follows:

. . .

D. *Liquidation: Accounting and Reports.* When the Lender conducts the liquidation, it will account for funds during the period of liquidation and will provide the Government with periodic reports on the progress of liquidation, disposition of collateral, resulting costs and additional procedures necessary for successful completion of liquidation. The Lender will transmit to the Government the *pro rata* share, of any payments received from the delinquent Borrower, and of liquidation or other proceeds etc. when the Government is the holder of a portion of the guaranteed loan using Form RD 1980–43, "Lender's Guaranteed Loan Payment to

Agency." When the Government liquidates, the Lender will be provided with similar reports on request.

E. *Determination of Loss and Payment.* In all liquidation cases, final settlement will be made with the Lender after the collateral is liquidated. The Government will have the right to recover losses paid under the guarantee from any party liable.

. . .

4. Form RD 449–30, "Loan Note Guarantee Report of Loss," will be used for calculations of all estimated and final loss determinations. Estimated loss payments may be approved by the Government after the Lender has submitted a liquidation plan approved by the Government. Payments will be made in accordance with applicable Government regulations.

5. When the Lender is conducting the liquidation, and owns any of the guaranteed portion of the loan, it may request a tentative loss estimate by submitting to the Government an estimate of loss, that will occur in connection with liquidation of the loan. The Government will agree to pay an estimated loss settlement to the Lender provided the Lender applies such amount due to the outstanding principal balance on the guaranteed debt. Such estimate will be prepared and submitted by the Lender on Form RD 449–30, "Loan Note Guarantee Report of Loss," using the basic formula as provided on the report except that the appraisal value will be used in lieu of the amount received from the sale of collateral. The Lender will discontinue interest accrued on the defaulted loan and the loss claim will be promptly processed in accordance with the applicable Government regulations. After the Report of Loss estimate has been approved by the Government, and within 30 days thereafter, the Government will institute procedures to cause the issuance of payment of the estimated amount due the Lender. After liquidation has been completed, a final loss report will be submitted on Form RD 449–30, "Loan Note Guarantee Report of Loss," by the Lender to the Government.

6. Before approval by the Government of any final loss report, the Lender must account for all funds during the period of liquidation, disposition of collateral, all costs incurred and any other information necessary for the successful completion of liquidation. Upon receipt of the final accounting and report of loss, the Government may audit the account and will determine the final loss. The Lender will make its records available to and otherwise assist the Government in making any audit. The documentation accompanying the report of loss must support the figures shown on Form RD 449–30, "Loan Note Guarantee Report of Loss."

7. When the Lender has conducted liquidation and after the final report of loss has been tentatively approved:

(a) If the loss is greater than the estimated loss payment, the Government will pay the additional amount owed by the Government to the Lender

(b) If the loss is less than the estimated loss, the Lender will reimburse the Government for the overpayment plus interest at the note rate from date of payment.

. . .

G. *Application of Government loss payment.* The estimated loss payment shall be applied as of the date of such payment. The total amount of the loss payment remitted by the Government will be applied by the Lender to the guaranteed portion of the loan debt. However, such application does not release Borrowers from liability. At time of final loss settlement the Lender will notify the delinquent Borrowers that the loss payment has been so applied. In all cases a final Form RD 449–30, "Loan Note Guarantee Report of Loss," prepared and submitted by the Lender must be processed by the Government.

. . .

N. *Refinancing.* Any loan guaranteed under this section may be refinanced and extended in accordance with the terms and conditions that the Government may prescribe, but in no event for an additional amount or term that exceeds the limitations under 7 C.F.R. part 3565.

O. *Nonassumption.* A Borrower under a loan that is guaranteed under 7 C.F.R. part 3565 and under which any portion of the principal obligation or interest remains unpaid may not be relieved of liability with respect to the loan, notwithstanding the transfer of property for which the loan was made.

. . .

By mid–2004, the Project was sustaining financial shortfalls and significant construction delays. The USDA guaranteed loan extended to the Project went into default in August 2004. In October 2004, the plaintiff and the USDA began discussions regarding liquidation of the Project. On October 7, 2004, Allied notified the USDA that Blues Alley, the borrower and developer, had rejected a proposed workout/forbearance arrangement, whereby a new developer would be retained and the Project's scope would be reduced. In early January 2005, after further discussions with the USDA, and in accordance with the Lender's Agreement entered into by the USDA and the plaintiff, Allied submitted a proposed Liquidation Plan for the Project to the USDA. In June 2005, after the plaintiff complied with several requests for additional information and refined the proposed Liquidation Plan, the USDA's Office of Rural Development approved the Liquidation Plan in accordance with the Lender's Agreement. According to the complaint, the approved Liquidation Plan provided that the plaintiff would foreclose on the property that was the subject of the Project. Also, according to the complaint, the Liquidation Plan required the USDA to reimburse Allied for its reasonable costs and expenses incurred in connection with carrying out the Liquidation Plan, including, but not limited to, legal costs and expenses associated with foreclosure of the property, which Allied advised the USDA would likely exceed the value of the collateral.

Further, according to the complaint, acting pursuant to the Liquidation Plan, Allied undertook "extensive, reasonable, and necessary efforts" against a litigious borrower to foreclose on the property via judicial foreclosure in the United States District Court for the Northern District of Mississippi, Delta Division. Allied was awarded a judgment on June 27, 2008, which included $281,790.89 for the plaintiff's attorneys' fees and expenses. *See Allied Home Mortg. Capital Corp. v. Blues Alley Estates L.P.,* No. 2:06–CV–00161, 2008 WL 3285901 (N.D.Miss.2008). The plaintiff informed the USDA that Allied had obtained title to the property, and attempted to present the title to the USDA on several occasions, without success. The plaintiff also requested reimbursement from the USDA for its expenses. According to the complaint, the USDA has refused to take title to the property or to reimburse Allied for any of its expenses, although, according to plaintiff, the USDA had "concurred with all steps taken by Allied."

After sending an October 30, 2008 email to the USDA, again advising that the foreclosure of the property had occurred and requesting guidance, on October 31, 2008, the plaintiff received an email from the USDA's Office of General Counsel (the OGC). The OGC communication stated, "this office represents the United States Department of Agriculture in a general capacity," and instructed the plaintiff to communicate with the OGC in the future. On January 15, 2009, the plaintiff sent a letter to the USDA's OGC tendering the Special Warranty Deed to the property and requesting immediate reimbursement of expenses (totaling $497,350.62) incurred by the plaintiff in executing the Liquidation Plan. The OGC replied by letter dated January 16, 2009, in which it returned the Special Warranty Deed to the property to the plaintiff, stating that the USDA's Rural Development division had advised the OGC of its decision not to accept the plaintiff's offer to convey the property.

On January 20, 2009, the plaintiff sent another letter to the OGC requesting a decision regarding title to the property. After additional correspondence, approximately six months later, on June 10, 2009, the OGC

finally responded to the plaintiff's January 2009 inquiries, stating:

As the lender on this loan, Allied has offered the Agency a deed in lieu of foreclosure. This is not consistent with the approved liquidation plan. Accordingly, the Special Warranty Deed is once again rejected by the Agency. The Agency will not take title to the real property.

It is the Agency's position that Allied should proceed to liquidate the property pursuant to the regulations and the loan agreement in a commercially reasonable manner. This duty has been and continues to be Allied's responsibility as the lender in the Guaranteed Rural Rental Housing Program. Allied has submitted a liquidation plan which the Agency has approved, and to which it expects Allied to adhere.

Furthermore, it is the Agency's position that reasonable costs associated with the liquidation of the property will be paid (offset) from the gross proceeds of the liquidation of the property. This is permitted by the regulations and the loan agreement. However, it is the position of the Agency that attorney's fees generated by counsel for Allied in the litigation against Derrick Neal [the President of Borrower and Developer Blues Alley] are not contemplated by the liquidation plan as approved by the Agency and it may not be recouped from the liquidation of the security.

Upon receipt of the June 10, 2009 OGC letter, on June 11, 2009, plaintiff sent a letter to the NAD. In the letter, plaintiff explained its position that the OGC's denial of plaintiff's request for reimbursement was incorrect:

The determination is wrong because ... Allied has complied with all requirements of the liquidation plan to the maximum extent possible. There is no market for the subject property in the area.... Additionally, construction at the site was defective and any prospective owner would have to remove and dispose of the defective construction materials which would add to the cost of any would be purchaser. Evidence of the lack [of] interest in the property was the fact that Allied was the only purchaser at [m]ultiple publicly advertised foreclosure sale notices. Attempts to market the property to individuals have proven fruitless.

The land could possibly be deeded to a non-profit but Allied would need the approval of USDA to make a gift of the land to such an agency. Since USDA is the beneficial owner of the property because it paid the bond claim, Allied is not free to dispose of the property without express USDA approval, which is being withheld.

Allied is incurring ad volem [sic] taxes on the property in addition to the other cash advances that it has made to protect an asset that belongs to the government. Additionally, every individual or company associated in any way with this transaction have been fully compensated, some reached a windfall profit with no objection by rural development.

Allied is appealing to your office to determine if the National Appeals Division has authority to overrule the decision of rural development denying Allied its costs and expenses associated with liquidating an asset that belongs to the government and to direct rural development to provide definitive instructions as to how the 11 acre tract of land should be disposed of....

On July 7, 2009, the plaintiff received a letter from the NAD stating that the plaintiff's appeal request did not meet the NAD's jurisdictional requirements. Specifically, the communication from the NAD stated, "[w]hile OGC is part of USDA, it is not an agency over which NAD has jurisdiction...." The NAD communication further noted that, "the OGC letter in question (dated June 11, 2009)[1], does not constitute an adverse decision as defined in 7 C.F.R. § 11.1." The NAD, therefore, denied the plaintiff's request for review. The NAD stated, however, "[i]f at a future date you receive an adverse decision from an agency under NAD's jurisdiction, the adverse decision will provide you administrative appeal rights, as appropriate."

1. The OGC letter at issue was dated June 10, 2009, not June 11, 2009.

On February 1, 2010, the plaintiff filed a complaint in this court alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and seeking a recovery in *quantum meruit* for services performed (Count III). The plaintiff alleges that "[t]he Liquidation Plan approved by the USDA and related documents and agreements ... constitute a valid and binding agreement ... between the USDA and Allied governing the liquidation and disposition of the Property at issue in the Blues Alley Project." The complaint repeatedly refers to a breach of "its [Allied's] Contract and the approved Liquidation Plan." The plaintiff's complaint seeks $496,512.96 in legal costs and expenses associated with the foreclosure of the property, $2,797.02 in property taxes paid by the plaintiff on the property, and also seeks any future, additional expenses the plaintiff may need to expend "on behalf of the United States to protect and preserve the value of the Property...."

## DISCUSSION

 "Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte.*" *Folden v. United States,* 379 F.3d 1344, 1354 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2004), *cert. denied,* 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); *see also Arbaugh v. Y & H Corp.,* 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); *Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d 1338, 1346 (Fed.Cir.2008); *Fanning, Phillips and Molnar v. West,* 160 F.3d 717, 720 (Fed. Cir.1998) (quoting *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (Fed.Cir. 1993)); *United States v. Newport News Shipbuilding and Dry Dock Co.,* 933 F.2d 996, 998 n. 1 (Fed.Cir.1991); *Thompson v. United States,* 88 Fed.Cl. 263, 266 (2009); *N. Star Alaska Hous. Corp. v. United States,* 76 Fed.Cl. 158, 185, *appeal dismissed,* 226 Fed.Appx. 1004 (Fed.Cir.2007). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." *Special Devices, Inc. v. OEA, Inc.,* 269 F.3d 1340, 1342 (Fed.Cir.2001) (citing *Johannsen v. Pay Less Drug Stores Nw., Inc.,* 918 F.2d 160,

161 (Fed.Cir.1990)); *see also Entegris, Inc. v. Pall Corp.,* 490 F.3d 1340, 1343 (Fed.Cir. 2007); *View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").

 Pursuant to this court's rules and Rule 8(a) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2); Fed.R.Civ.P. 8(a)(1), (2) (2010). *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 555–57, 570, 127 S.Ct. 1955). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)), *reh'g denied* (Fed.Cir. 1997); *see also Edelmann v. United States,* 76 Fed.Cl. 376, 379 (2007). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir. 1998); *see also McZeal v. Sprint Nextel Corp.,* 501 F.3d 1354, 1363 n. 9 (Fed.Cir.2007) (Dyk, J., concurring in part, dissenting in part) (quoting 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1286 (3d ed. 2004)); *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). As stated in *Ashcroft v. Iqbal,* "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' [*Bell Atlantic Corp. v. Twombly,*] 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it

778

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S.Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

■ When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed.Cir.2006); *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed.Cir.2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed.Cir.2002); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1338 (Fed.Cir.2001) (quoting *New Valley Corp. v. United States*, 119 F.3d 1576, 1580 (Fed.Cir.1997)), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir.2000). The defendant states that, for purposes of its motion to dismiss, "we accept as true certain factual allegations set forth in the complaint."

■ The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on Federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47

L.Ed.2d 114 (1976); *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 875 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied*, 552 U.S. 1142, 128 S.Ct. 1082, 169 L.Ed.2d 810 (2008); *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States*, 33 Fed.Cl. 474, 478 (1995), *aff'd*, 79 F.3d 136 (Fed.Cir.1996).

Defendant's motion to dismiss is based on the provisions of the Reorganization Act and the Act's implementing regulations, which establish specific administrative procedures to process claims arising from participation in specified USDA programs. The purpose of the Act, as stated in 7 U.S.C. § 6901, was to provide the Secretary of Agriculture with "the necessary authority to streamline and reorganize the Department of Agriculture to achieve greater efficiency, effectiveness, and economies in the organization and management of the programs and activities carried out by the Department." 7 U.S.C. § 6901. One of the changes included in the Reorganization Act was the creation of an independent National Appeals Division within the USDA to review adverse agency decisions. *See* 7 U.S.C. § 6992(a).

■ Determination of whether Allied has filed its case in the proper forum, therefore, begins with the Reorganization Act. The first step in statutory construction is " 'to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)); *see also Jimenez v. Quarterman*, 555 U.S. 113, 129 S.Ct. 681, 685, 172 L.Ed.2d 475 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d 1317, 1323 (Fed.Cir.) ("When interpreting any statute, we look first to the statutory language."), *reh'g and reh'g en banc denied* (Fed.Cir. 2010). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent

and consistent.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) ("It is, moreover, ' "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." ' " (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)))); *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker*, 533 U.S. at 174, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage").

 When the statute provides a clear answer, the court needs to look no further. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941; *see also Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1300 (Fed.Cir.2008), *reh'g granted*, 319 Fed.Appx. 914 (Fed.Cir.2009). Thus, when the " 'statute's language is plain, "the sole function of the courts is to enforce it according to its terms." ' " *Johnson v. United States*, 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d 388, 391 (Fed.Cir.1994) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) and *Darby v. Cisneros*, 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391 (citing *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)).

Under the terms of the Reorganization Act, a "participant" in a USDA program receiving an adverse, agency decision may request an informal hearing on the "adverse decision." 7 U.S.C. § 6995(a). A "participant" also may appeal an "adverse decision" to the National Appeals Division. *See* 7 U.S.C. § 6996(a). The statute states:

**(a) Appeal to Division for hearing**

Subject to subsection (b) of this section, a participant shall have the right to appeal an adverse decision to the Division for an evidentiary hearing by a hearing officer consistent with section 6997 of this title.

7 U.S.C. § 6996(a).

The statute defers the definition of the term "participant" to the implementing regulations. *See* 7 U.S.C. § 6991(9). The relevant implementing regulation defines "participant" as follows:

*Participant* means any individual or entity who has applied for, or whose right to participate in or receive, a payment, loan, loan guarantee, or other benefit in accordance with any program of an agency to which the regulations in this part apply is affected by a decision of such agency. The term does not include persons whose claim(s) arise under:

. . .

(2) Programs governed by Federal contracting laws and regulations (appealable under other rules and to other forums, including to the Department's [USDA]

Board of Contract Appeals under 7 CFR part 24)....

7 C.F.R. § 11.1.

The statute defines the terms "adverse decision" and "agency," as follows:

For purposes of this subchapter:

**(1) Adverse decision**

The term "adverse decision" means an administrative decision made by an officer, employee, or committee of an agency that is adverse to a participant. The term includes a denial of equitable relief by an agency or the failure of an agency to issue a decision or otherwise act on the request or right of the participant. The term does not include a decision over which the Board of Contract Appeals has jurisdiction.

**(2) Agency**

The term "agency" means any agency of the Department designated by the Secretary or a successor agency of the Department, except that the term shall include the following (and any successor to the following):

. . .

**(E)** The Rural Development Administration.

. . .

7 U.S.C. § 6991(1)–(2).

The statute also describes how judicial review of decisions from the NAD will be conducted:

**Judicial review**

A final determination of the Division [NAD] shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5.

7 U.S.C. § 6999. However, the statute also provides that judicial review is unavailable before a claimant exhausts its administrative remedies:

**(e) Exhaustion of administrative appeals**

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against—

(1) the Secretary;

(2) the Department; or

(3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e).

Although the statutory language of the Reorganization Act is clear, the legislative history of the Act reaffirms which USDA programs and activities are intended to fall under the jurisdiction of the newly created NAD, as indicated in the following question and answer included in the legislative record:

*Question 1.* List each of the USDA programs and activities that will be appealable under the new National Appeals Division (NAD), which agency these programs and activities are currently under, and how appeals are now handled for them, including discrimination complaints by producers or borrowers?

Answer. The following constitutes the programs and activities that will fall within the new NAD, the agency such programs or activities currently are under, and how appeals currently are handled for these activities and programs:

(a) The loan, loan guarantee, and grant programs currently contained within ... the Rural Development Administration and proposed for inclusion in the Farm Service Agency ... including farmer program loans, housing program loans, community and business program loans; and all grants administered by the above agencies....

"Questions Submitted by Congressman Stenholm re the National Appeals Division and USDA Answers," H.R.Rep. No. 103–714, pt. 1, at 113 (1994), 1994 WL 461734, at *95.

The legislative history of the Reorganization Act also reaffirms which "programs and activities" are to be excluded from the jurisdiction of the NAD. Notably, the list of excluded programs does not include the USDA Rural Development Assistance Program:

*Question 2.* List each of the programs and activities that will not be appealable under the new Division, with an explanation as to why they were not included. Similarly, do

you anticipate retaining any existing USDA appeals procedures? If so, which ones, and why?

Answer. The following is a list of the principal categories of programs and activities that will not be appealable under the new NAD and the reasons for their exclusion:

. . .

(g) Agency actions presently appealable to the Department of Agriculture Board of Contract Appeals—such actions directly relate to government procurement and are distinctly different from the program-based appeals that the new NAD is designed to handle [sic] a specific appeals process has been established by statute for the actions.

. . .

With regard to the programs and activities falling within the purview of the new NAD, the existing USDA appeal structures that apply to appeals at the State, county, and local levels in large part, will be retained to ensure continued accessibility, convenience, informality, and expeditious response for program participants. In addition, those existing procedures applicable to programs and activities not covered by the new NAD also will be retained. In short, the scope of the appeals system we have proposed for the new NAD would include all appeals from decisions made under farm programs, farmer loan programs, and other producer-related programs carried out by the county-based USDA agencies, but would not include appeals made under other, unrelated USDA programs. We believe that expansion of the NAD's role beyond these parameters would create an extremely unwieldy mechanism for administrative appeals, and would substantially distort the purpose to be served by consolidating these producer-related and other similar appeals authorities into a single entity within the Department.

"Questions Submitted by Congressman Stenholm re the National Appeals Division and USDA Answers," H.R.Rep. No. 103–714, pt. 1, at 114–15 (1994), 1994 WL 461734, at *96–97.

Following the enactment of the statute, 7 U.S.C. § 6901, et seq., the USDA issued implementing regulations on the "National Appeals Division Rules of Procedures," which track and amplify the statute. *See* 7 C.F.R. § 11.1, et seq. The regulations define "adverse decision" as:

*Adverse decision* means an administrative decision made by an officer, employee, or committee of an agency that is adverse to a participant. The term includes a denial of equitable relief by an agency or the failure of an agency to issue a decision or otherwise act on the request or right of the participant within timeframes specified by agency program statutes or regulations or within a reasonable time if timeframes are not specified in such statutes or regulations. The term does not include a decision over which the [Civilian] Board of Contract Appeals has jurisdiction.

7 C.F.R. § 11.1.

Again, detailing which USDA organizations the NAD was intended to cover, the regulations, like the statute, define "Agency" to include "Rural Development (RD)...." 7 C.F.R. § 11.1.

In addition, the regulations include the following directives:

§ 11.2 General statement.

(a) This part sets forth procedures for proceedings before the National Appeals Division within the Department....The authority of the Hearing Officers and the Director of the Division, and the administrative appeal procedures which must be followed by program participants who desire to appeal an adverse decision and by the agency which issued the adverse decision, are included in this part.

(b) Pursuant to section 212(e) of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub.L. 103–354 (the Act), 7 U.S.C. 6912(e), program participants shall seek review of an adverse decision before a Hearing Officer of the Division, and may seek further review by the Director, under the provisions of this part prior to seeking judicial review.

§ 11.3 **Applicability.**

(a) *Subject matter.* The regulations contained in this part are applicable to adverse decisions made by an agency, including, for example, those with respect to:

(1) Denial of participation in, or receipt of benefits under, any program of an agency;

(2) Compliance with program requirements;

(3) The making or amount of payments or other program benefits to a participant in any program of an agency. . . .

7 C.F.R. §§ 11.2–11.3.

Moreover, the USDA implementing regulation, like the statute, is explicit regarding when and where disappointed claimants can seek judicial review:

§ 11.13 **Judicial review.**

(a) A final determination of the Division shall be reviewable and enforceable by any United States District Court of competent jurisdiction in accordance with chapter 7 of title 5, United States Code.

7 C.F.R. § 11.13.

In plaintiff's case, the Lender's Agreement, signed by Allied, and the Loan Note Guarantee both, specifically include references to 7 C.F.R. Part 3565 of the Guaranteed Rural and Rental Housing Program regulations. The Lender's Agreement has multiple such references, including the opening paragraph, which states, "[t]he Lender ('Lender') is approved to process and request Loan Note Guarantees and to service those loans as authorized herein and under 7 C.F.R. part 3565." The regulations in 7 C.F.R. § 3565, et seq. establish a clear nexus between the Rural and Rental Housing programs and the NAD and require that review of agency adverse decisions issued to a borrower or lender participating in the program, in this case Allied, are to be reviewed by the NAD:

Review and appeals.

Whenever RHS [Rural Housing Service] makes a decision that is adverse to a lender or a borrower, RHS will provide written notice of such adverse decision and of the right to a USDA National Appeals Division hearing in accordance with 7 CFR part 11 or successor regulations. The lender or borrower may request an informal review with the decision maker and the use of available alternative dispute resolution or mediation programs as a means of resolution of the adverse decision. Any adverse decision, whether appealable or non-appealable may also be reviewed by the next level RHS supervisor. . . .

7 C.F.R. § 3565.14.

In sum, the Reorganization Act and the implementing regulations are explicit that a program "participant" must exhaust USDA administrative remedies, including receiving an adverse agency decision, and must continue through an appeal filed at the NAD. If the program participant still is dissatisfied, the participant may then appeal to the appropriate United States District Court. The implementing regulations for the NAD and the USDA Rural Development program are consistent with the statute and reinforce the path a disappointed, program participant must follow. Although the statute and the regulations contemplate an exception for claims arising out of standard government procurements for goods and services, for which jurisdiction resides in this court or in the Civilian Board of Contract Appeals, as is discussed more fully below, plaintiff's claim does not fall into this category.

In its motion to dismiss, the defendant makes three arguments: 1) exclusive jurisdiction to review plaintiff's claims for reimbursement, which derived from a loan guarantee program housed in the USDA Rural Development Administration, resides in the appropriate federal District Court, pursuant to the Reorganization Act, after exhaustion of USDA administrative remedies, 2) the Liquidation Plan is not a separate, express or implied contract with the government which would provide a basis for jurisdiction in this court pursuant to the Tucker Act, and 3) this court lacks jurisdiction to entertain the plaintiff's *quantum meruit* claim. The defendant asserts that the dispute arose out of a "loan note guarantee agreement" between plaintiff and the Office of Rural Development at the USDA, which "enabled Allied to process and

request loan note guarantees, and required Allied to service the loans in accordance with program regulations and ensure that all program requirements were met."

In response, the plaintiff asserts that the Liquidation Plan constitutes a contract with the government that is separate and distinct from the loan guarantee program, thereby negating the applicability of the Reorganization Act, and allowing judicial review for breach of contract by this court pursuant to the Tucker Act. In support of its claim, plaintiff also asserts that the "evasive actions" by the USDA's Office of Rural Development have made an agency decision impossible to obtain. Alternatively, the plaintiff argues that the unique circumstances of the case warrant this court taking jurisdiction of its *quantum meruit* claim.

 The Rural Development Lender's Agreement was guaranteed by the USDA through a Rural Housing Service program administered by the USDA's Office of Rural Development, and provided for submission of a Liquidation Plan if the Project failed. On the Lender's Agreement, "Allied Mortgage Capital Corporation" is listed as the "Participating Lender" or "Lender." Allied also is listed as the "Lender" on the USDA "Rural Housing Service Loan Note Guarantee." Allied, therefore, meets the definition of "participant" provided in the implementing regulations to the Reorganization Act, quoted above. *See* 7 C.F.R. § 11.1. The relationship between the government and plaintiff, including the plaintiff's contractual obligation to liquidate, derived from the plaintiff's participation in the loan program. The Reorganization Act, as well as the implementing regulations, establish that final, adverse, agency decisions against participants in loan guarantee programs administered by the USDA's Rural Development division are to be appealed to the NAD, and that NAD decisions only may be appealed to the appropriate federal District Court. *See* 7 U.S.C. §§ 6991(2)(E), 6999. Because the Lender's Agreement specifically contemplates a Liquidation Plan in case of project failure, this court is unconvinced that the Liquidation Plan can be characterized as a separate and distinct contract, independent of the contractual obligations established in the Lender's Agreement, which was entered into as part of the Rural Development loan program in support of the Project. Indeed, the Lender's Agreement gave rise to each of the subsequent documents for the Blues Alley Project, including the Liquidation Plan. Although contractual in nature, the Liquidation Plan arose from the Rural Development-administered loan note guarantee program, was foreseen in the Lender's Agreement and, therefore, is governed by the procedures outlined in the Reorganization Act and the implementing regulations.[2] To extract individual agreements entered into as part of a loan guarantee on a Rural Development backed project in order to evade the jurisdictional framework established in the Reorganization Act and implementing regulations, effectively, would repeal the established statutory and regulatory framework.

When rejecting plaintiff's request for review, the NAD also pointed out that the plaintiff had not received an agency "adverse decision" and had not exhausted agency administrative remedies, completion of which is necessary before an action properly may be brought to the NAD. *See* 7 U.S.C. § 6912(e). The defendant states that after the Blues Alley Project went into default, and the Liquidation Plan prepared by Allied was approved, "Allied has not demonstrated, or even alleged, that it submitted a proper loss claim on Form RD 449–30, as required by Section VII.E.4. of the Lender's Agreement.... Nor has Allied demonstrated, or even alleged, that it has pursued any denial of any claim through the USDA's mandatory appeals process...." Section VII.E.4 of the Lender's Agreement states that "Form RD 449–30, 'Loan Note Guarantee Report of Loss,' will be used for calculations of all estimated and final loss determinations. Es-

---

2. By contrast, a USDA contract to obtain supplies or services, for example for office supplies or computer support services, for use by the Office of Rural Development, would not be subject to the requirements of the Reorganization Act, but could be challenged either in this court or at the Civilian Board of Contract Appeals. *See* 41 U.S.C. §§ 601, 602(a), 606, 607(d), 609(a)(1) (2006).

timated loss payments may be approved by the Government after the Lender has submitted a liquidation plan approved by the Government." Additionally, Section VII.G of the Lender's Agreement states that, "[i]n all cases a final Form RD 449–30, 'Loan Note Guarantee Report of Loss,' prepared and submitted by the Lender must be processed by the Government."

The defendant points out, without objection from the plaintiff, that Allied never submitted its loss claims on Form RD 449–30, and that if it had done so, and had the claim been denied, this would have constituted an adverse agency decision, appealable first to the NAD and then to the appropriate federal District Court. As noted above, the plaintiff's request for reversal of the OGC letter was rejected because the NAD found that the OGC letter was not an appealable, adverse agency decision, and that the OGC is not an agency over which the NAD has jurisdiction. Plaintiff responds, however, that the government's argument with regard to Form RD 449–30 is being raised for the first time in the defendant's motion to dismiss, and that plaintiff, in fact, tried to pursue an administrative appeal to the NAD.

The statute, regulations and loan program documents are clear that when making a claim pursuant to an Office of Rural Development loan guarantee, Allied should have pursued procedures described in the Lender's Agreement, as quoted above, by first submitting its claims on Form RD 449–30 and then exhausting established administrative remedies. Then, if plaintiff wished to appeal an adverse decision on the claim, it should have done so at the NAD, prior to seeking judicial review in the appropriate federal District Court. Plaintiff, as a participant in the program, was bound by the program requirements, including requirements articulated in the applicable statutes and implementing regulations.

The record also suggests, however, that although plaintiff was continually in communication with program officials and the OGC, Allied was given a bureaucratic run around, through late responses and silence as to the proper agency procedures plaintiff should follow in order to pursue its claims. Executive branch lawyers are frequently reminded by their agency clients that the function of the OGC is advisory, and that agency program officials, not attorneys, are vested with the program decision-making authority, including issuing adverse decisions on agency programs. The OGC attorneys knew, or should have known, that they could not issue an appealable agency decision, despite their instructions to the plaintiff to communicate with the OGC. Very late in the process, the NAD letter advised plaintiff that the OGC is not one of the USDA agencies over which the NAD has jurisdiction and that administrative remedies had not been exhausted, given that no adverse decision had been issued by the agency. Nonetheless, plaintiff should have understood from the Lender's Agreement, which the plaintiff signed, that use of Form RD 449–30 was a necessary first step to properly initiate a monetary claim, and that by participating in the Rural Development program, agency procedures to contest any rejection of plaintiff's claim would apply. Although the government personnel with whom plaintiff had frequent contact easily could have assisted plaintiff in this regard, and should have done so in their public service role, this unfortunate history cannot create subject matter jurisdiction in this court where no jurisdiction exists.

Even if plaintiff's claims had been properly presented to the agency on the appropriate forms, and appealed to the NAD, and even if the NAD had subsequently rendered a negative decision, this court still would not have jurisdiction to review the plaintiff's claims. As stated above, the statute explicitly states that, "[a] final determination of the Division [NAD] shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5." 7 U.S.C. § 6999; *see also Bruhn v. United States,* 74 Fed.Cl. 749 (2006) (citing *Deaf Smith Cnty. Grain Processors, Inc. v. Glickman,* 162 F.3d 1206, 1211 (D.C.Cir. 1998)). The *Bruhn* court adopted the *Deaf Smith* analysis that " '[7 U.S.C] § 6999 provides the district court with jurisdiction over *all* final determinations of the NAD.' " *Bruhn v. United States,* 74 Fed.Cl. at 755 (quoting *Deaf Smith Cnty. Grain Processors,*

*Inc. v. Glickman,* 162 F.3d at 1211 (emphasis in original)). This court, therefore, concludes that it does not have jurisdiction over Allied's asserted contract claims as a result of plaintiff's participation in the loan note guarantee program administered by the USDA's Rural Development division.

 Plaintiff's assertion for recovery in *quantum meruit* as a basis for jurisdiction also must fail. "*Quantum meruit* is '[a] claim or right of action for the reasonable value of services rendered.'" *United Pac. Ins. Co. v. United States,* 464 F.3d 1325, 1329 (Fed.Cir.2006) (quoting *Black's Law Dictionary* 1276 (8th ed. 2004)). The United States Court of Appeals for the Federal Circuit distinguishes two types of *quantum meruit* claims: implied-in-law and implied-in-fact. *See Int'l Data Prods. Corp. v. United States,* 492 F.3d 1317, 1325 (Fed.Cir.2007). An implied-in-law contract is

> a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice. The Court of Federal Claims, however, lacks jurisdiction over contracts implied in law. 28 U.S.C. § 1491(a)(1) (2000). On the other hand, "[w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract but rather under an implied-in-fact contract." *United Pac. Ins. Co. v. United States,* 464 F.3d at 1329–30.

*Int'l Data Prods. Corp. v. United States,* 492 F.3d at 1325–26; *see also Perri v. United States,* 340 F.3d 1337, 1343 (Fed.Cir.2003) ("Recovery in *quantum meruit,* however, is based upon a contract implied in law." (citing *Fincke v. United States,* 230 Ct.Cl. 233, 246, 675 F.2d 289, 296 (1982))); *Sanders v. United States,* 252 F.3d 1329, 1334 (Fed.Cir.2001); *Steinberg v. United States,* 90 Fed.Cl. 435, 443 (2009). Thus, the Court of Federal Claims does not have jurisdiction over implied-in-law contract claims, but does have jurisdiction over express and implied-in-fact contracts.

 In this case, Allied has alleged entitlement for services performed as a result of a contract entered into with USDA, asserted by plaintiff to be the Liquidation Plan. An implied-in-fact contract cannot exist, however, when there is an express, written contract. *See Hercules Inc. v. United States,* 516 U.S. 417, 423–24, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (stating that the Tucker Act only extends to express or implied-in-fact contracts, based on a meeting of the minds, and not implied-in-law contracts, and that implied-in-fact contracts are agreements "not embodied in an express contract"); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997) ("Further, an implied-in-fact contract cannot exist if an express contract already covers the same subject matter.") (citing *Atlas Corp. v. United States,* 895 F.2d 745, 754–55 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990) and *Reforestacion de Sarapiqui v. United States,* 26 Cl.Ct. 177, 190, *aff'd,* 985 F.2d 583 (Fed.Cir.1992)).

 With respect to the plaintiff's *quantum meruit* claim, both parties rely on *Enron Federal Solutions, Inc. v. United States,* 80 Fed.Cl. 382 (2008). In *Enron,* the United States Court of Federal Claims addressed the court's jurisdiction over equitable claims. *Id.* at 409 (citing *Trauma Serv. Group, Ltd. v. United States,* 33 Fed.Cl. 426, 432 (1995), *aff'd,* 104 F.3d 1321 (Fed.Cir.1997) and *Perri v. United States,* 340 F.3d at 1343–44). The *Enron* court clarified the narrow circumstances under which the Court of Appeals for the Federal Circuit and the Court of Federal Claims have permitted *quantum meruit* recovery, namely when a plaintiff "provides services or goods to the government pursuant to an *attempted* express contract, but … the government simply refuses to pay." *Enron Fed. Solutions, Inc. v. United States,* 80 Fed.Cl. at 409 (citing *Perri v. United States,* 340 F.3d at 1343–44) (emphasis in original). The plaintiff alleges that the Liquidation Plan constituted a separate contract or an "*attempted* express contract," (emphasis in original), and that the Office of Rural Development's failure to pay for the plaintiff's

services under the Liquidation Plan justifies the grant of relief by this court.

 As discussed above, however, an implied-in-fact contract cannot be found when an express contract between the two parties on the same subject matter already exists. *See Enron Fed. Solutions, Inc.*, 80 Fed.Cl. at 410 (citing *Trauma Serv. Group v. United States*, 104 F.3d at 1326 and *Atlas Corp. v. United States*, 895 F.2d at 754–55). The express contract between the parties was the Lender's Agreement, which, as defendant correctly points out, unambiguously covered the submission and approval of a Liquidation Plan. Although defendant acknowledges that the Liquidation Plan was submitted to, reviewed and approved by USDA officials, defendant also argues that the Liquidation Plan was not a contract at all, because it "is not signed by any Government representative, does not purport to contain any express offer and acceptance by the Government, and does not contain any reference that could be construed to create a legal obligation on the part of the Government." The court agrees that the Rural Development Lender's Agreement was the express contract which governed the relationship between the parties. The Liquidation Plan was not a separate contract; rather, it was anticipated as a requirement in the Lender's Agreement under circumstances such as those presented by the failing Blues Alley Project. Therefore, plaintiff's *quantum meruit* claim cannot be entertained by this court.

## CONCLUSION

The Reorganization Act requires that the NAD review disputes regarding final agency decisions which arise from the USDA's Rural Development programs and loan note guarantees issued by those programs. The Reorganization Act also dictates that NAD decisions are reviewable exclusively by the appropriate federal District Court. Furthermore, a claim for *quantum meruit* recovery is not cognizable when an express contract exists between the parties on the same subject matter. Plaintiff's complaint in this court, therefore, must be dismissed for lack of subject matter jurisdiction. Accordingly, the defendant's motion to dismiss pursuant to RCFC 12(b)(1) is **GRANTED,** and the plaintiff's complaint is **DISMISSED.** The Clerk of the Court shall enter judgment consistent with this opinion. No costs.

**IT IS SO ORDERED.**